Luis Velázquez Ortiz, Olga María Umaña y otros, demandantes y recurrentes, *v.* Universidad de Puerto Rico, etc., demandados y recurridos.

*Número:* RE-91-57          *Resuelto:* 5 de abril de 1991

*Tomás Correa Acevedo,* de *Correa Acevedo, Mainardi & Rivera Santana,* abogado de los recurrentes; los recurridos no comparecieron.

## SENTENCIA
## (Regla 50)

Comparecen ante nos los peticionarios, hermanos y abuelos del infante Richard Velázquez Umaña para impugnar, por insuficientes, las cuantías de las compensaciones concedidas a ellos por los sufrimientos resultantes de la muerte del mencionado niño a consecuencia de la negligencia de la parte demandada.

Los codemandantes Luis Velázquez Ortiz y Olga María Umaña procrearon durante su matrimonio dos (2) varones y una (1) niña. Esta última, de nombre Daisy Velázquez Umaña, a la fecha de la muerte de su hermanito Richard tenía catorce (14) años de edad. Su otro hermano, el codemandante Luis A. Velázquez Umaña, tenía nueve (9) años y el occiso tenía tres (3) años y cuatro (4) meses. Eran los abuelos paternos de dichos menores los esposos codemandantes, Don Laureano Velázquez Torres y Doña Marcelina Ortiz Rivera.

El nacimiento del finado Richard Velázquez Umaña fue prematuro. El niño pesó al nacer dos y media (2 1/2) libras y midió dieciséis (16) pulgadas. Durante su primer año, el desarrollo de éste fue sumamente lento y difícil. Estuvo en varias ocasiones al borde de la muerte. Caminó tarde, empezó a hablar después del año y, por su condición, durante los primeros meses de vida requirió de cuidados especiales y de mayor atención y cariño de los miembros inmediatos de su familia. Los sufrimientos padeci-

dos por los hermanos y los abuelos de dicho menor fueron descritos por el tribunal de instancia del modo siguiente:

El menor codemandante Luis A. Veláquez Umaña, quien nació el 26 de diciembre de 1976, tenía buenas relaciones con su hermanito Richard. Luis tenía 9 años al morir Richard. Practicaban juegos y se divertían juntos; a veces en unión a los demás miembros de la familia. Sufrió mucho Luis por la muerte de su hermanito y recriminaba por ello a la madre, diciéndole que por qué no lo dejó como estaba. Después de la muerte a veces se pasaba mirando el techo. Sufrió lo que se espera que sufra un hermano por la muerte de otro hermanito, en las circunstancias en que falleció Richard Velázquez Umaña. (Esta última parte de esta determinación de hecho fue estipulada por las partes).

La menor Daisy Velázquez Umaña, quien nació el 2 de octubre de 1972, quería mucho a su hermano menor. Tenía ella 14 años y medio cuando él murió. El cariño era más de lo usual por razón de que Richard nació después de 5 años del nacimiento del otro hermano y vino como a llenar un vacío. Ella lo atendía en la cuna; a veces "lo dormía en la cama". El le decía "Titi". Sufrió ella lo que se espera que sufra una hermana por la muerte de un hermanito, considerando las circunstancias particulares en que falleció Richard Velázquez Umaña. (La última parte de esta determinación de hecho fue estipulada por las partes.)

Los codemandantes Laureano Velázquez Torres y Marcelina Ortiz Rivera son los abuelos paternos del finado menor Richard Velázquez Umaña. Viven en un sector cercano al lugar donde residía dicho menor con sus padres. Se relacionaban con él, ya que el niño iba con los padres semanalmente a visitarlos. Era el último de los nietos. Cuando el niño murió lo llevaron a velar a la casa de estos abuelos y allí ellos compartieron el dolor con los demás familiares. Sufrieron ambos por la pérdida de este nieto lo que se espera que sufran unos abuelos al ver perder un nieto, considerando las circunstancias particulares en que falleció Richard Velázquez Umaña. (Esta última parte de esta determinación de hecho fue estipulado por las partes). *Exhibit* I, págs. 12–13.

Por tales sufrimientos y angustias, el tribunal concedió la cantidad de $7,500 a Daisy Velázquez Umaña y de $5,000 a su hermano Luis A. Velázquez Umaña. Concedió la suma de $3,500 a cada uno de los abuelos del menor.

De ordinario, este Foro apelativo guardará deferencia y no entrará a variar la valorización de los daños hecha por el foro de instancia, ya que son estos magistrados los que vienen en contacto directo con la prueba testifical y, por ende, son los que están en mejor posición de emitir juicio en torno a los mismos. Dicha tarea es difícil y compleja, toda vez que "no existe una tabla o computadora electrónica que recoja todos los elementos y premisas inarticuladas que nutren la valorización del dolor físico y mental humano y permita, mediante la aplicación de unas teclas o el oprimir unos botones, obtener el resultado final apropiado. Esta función descansa sobre el ejercicio discrecional prudente, juicioso y razonable del juzgador de hechos animado por un sentido de justicia o de conciencia humana". *Urrutia v. A.A.A.*, 103 D.P.R. 643, 647–648 (1975). No obstante, de este Tribunal apelativo entender que la cuantía concedida en instancia es ridículamente baja o exageradamente alta, podría intervenir y ajustarla. *Urrutia v. A.A.A.*, supra.

Si bien es cierto que no existen dos (2) casos exactamente iguales y que cada caso es distinguible según sus propias circunstancias, nuestra casuística ha pautado "que es aconsejable que los tribunales de instancia utilicen como guía o punto de partida las cuantías concedidas por este Tribunal en casos 'similares' anteriores [pero] la decisión que se emita en un caso en específico en relación con esta materia no puede ser considerada como precedente obligatorio para otro caso". *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443, 452 (1985), y casos allí citados. Véase *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990).

Expuesto este marco doctrinario y vistas las circunstancias particulares del caso de epígrafe, es nuestro entender que erró el tribunal de instancia en su valorización de los daños sufridos por los abuelos y hermanos del occiso. La suma concedida a éstos es injustificadamente baja; no guarda relación con los daños sufridos y no cumple adecuadamente con su función reparadora. En justicia procede que la aumentemos a la suma de $10,000 a cada uno de los hermanos y abuelos del menor fallecido, aquí recurrentes.

Sostiene la parte demandante que la conducta observada por los demandados fue temeraria y que el hecho de que hayan aceptado su responsabilidad luego de haber negado la misma en la contestación a la demanda no les hace inmunes a la imposición de honorarios. Solicita que dicha partida se aumente a $30,000. La Universidad de Puerto Rico, por su parte, señala que fue después de un extenso trámite de descubrimiento de prueba cuando se cercioró de que hubo impericia médica profesional por parte de los galenos del Hospital Pediátrico. En vista de ello, presentó una Moción Conjunta para Limitar Controversias en la que aceptó su responsabilidad. Sostiene que la partida de honorarios concedida por el tribunal a quo debe eliminarse.

Nuestra Regla 44.1(d) de Procedimiento Civil, 32 L.P.R.A. Ap. III, consagra el principio general de que "en caso de que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta". Si bien nuestras reglas procesales no han definido este concepto, es sabido por todos que la temeridad es "una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia. También sujeta al litigante inocente a la ordalía del proceso judicial y lo expone a gastos innecesarios y a la contratación de sevicios profesionales, incluyendo abogados, con gravamen a veces exhorbitantes para su peculio". H. Sánchez Martínez, *Rebelde sin costas*, Año 4 (Núm. 2) Boletín Judicial (abril–junio 1982). La casuística, por su parte, se ha encargado de ir perfilando sus contornos.

Se ha señalado que:

El propósito principal de autorizar la imposición de honorarios de abogado en casos de temeridad, es la de establecer una penalidad a un litigante perdidoso que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito. *Soto* v. *Lugo*, 76 D.P.R. 444 (1954). *Hemos señalado que la acción que amerita la condena de*

*honorarios de abogado es cualquiera que haga necesario un pleito que se pudo evitar, McCormick v. Vallés,* 55 D.P.R. 226, 233 (1930); que lo prolongue innecesariamente, *Stella* v. *Bonilla,* supra [65 D.P.R. 542 (1946)]; *Ortiz* v. *Viera,* 59 D.P.R. 358 (1941), o que produzca la necesidad de que otra parte incurra en gestiones evitables. *San Antonio* v. *Jiménez & Fernández, Sucs.,* 63 D.P.R. 215, 220 (1944). (Énfasis suplido.) *Fernández v. San Juan Cement Co., Inc.,* 118 D.P.R. 713, 718–719 (1987).

En el reciente caso de *Corpak, Art Printing v. Ramallo Brothers,* 125 D.P.R. 724, 738 (1990), este Tribunal señaló como factores a sopesar al imponer una cuantía de honorarios por temeridad "la naturaleza del litigio, las cuestiones de derecho envueltas en el mismo, la cuantía en controversia, el tiempo invertido, los esfuerzos y actividad profesional que hayan tenido que desplegarse, y la habilidad y reputación de los abogados envueltos . . . deberá mantenerse presente que el grado o intensidad de la conducta temeraria o frívola es el criterio o factor determinante y crítico . . .". (Énfasis suprimido.)

Visto el trámite procesal habido en el caso de autos, a la luz de los parámetros previamente expuestos, es nuestro entender que la parte demandada incurrió en conducta temeraria. La sentencia del foro de instancia le dedica varias páginas al pedregoso trámite procesal sufrido debido a la conducta de la parte demandada. En la medida en que la parte demandada hizo necesario un litigio que se pudo evitar y obligó a la parte demandante a incurrir en gastos innecesarios y a sufrir molestias, en igual grado su conducta fue temeraria. Si bien las partes aceptaron su negligencia, lo hicieron tres años y medio (31/2) después de haberse iniciado este litigio. Ello no subsana la conducta temeraria observada. En consecuencia, es nuestro parecer que erró el foro de instancia al conceder la módica cifra de $1,500 por concepto de honorarios. La misma debe ser aumentada a la suma de $5,000.

Por los fundamentos expuestos se dicta sentencia que modifique la dictada por la Sala de San Juan del Tribunal Superior de Puerto Rico a los fines de conceder a los recurrentes las partidas de *$10,000 a cada uno* de los abuelos y hermanos del finado, y que

aumente a $5,000 la cuantía concedida por concepto de honorarios de abogado.

Así lo pronunció y manda el Tribunal y certifica el señor Subsecretario General.

El Juez Asociado Señor Alonso Alonso, a quien se ha unido la Juez Asociada Señora Naveira de Rodón, concurre mediante opinión escrita aumentando aún más dichas partidas.

*(Fdo.)* Heriberto Pérez Ruiz
*Subsecretario General*

—O—

Opinión concurrente del Juez Asociado Señor Alonso Alonso, a la cual se une la Juez Asociada Señora Naveira de Rodón.

Concurro con la Sentencia (Regla 50) dictada por el Tribunal en la medida en que aumenta las indemnizaciones a los hermanos y abuelos del finado y la cuantía por concepto de honorarios de abogado. Sin embargo, el aumento no es suficiente. Los hechos del caso de autos requieren un aumento mayor. Veamos.

En autos se trata de un núcleo familiar especial donde, por la condición lamentable del finado en vida, toda la familia —padres, hermanos y abuelos— logró hacer de una tragedia un ambiente familiar de cariño, de apoyo y de ayuda mutua para lograr que el finado fuera lo más feliz posible dentro de sus circunstancias. Logró excelentes relaciones interpersonales y de cariño.[1] Bajo estas circunstancias, el dolor y el sufrimiento por la pérdida *de la persona que generó* esas relaciones es mucho mayor que bajo otras circunstancias.

---

[1] La existencia de relaciones de cariño y afecto dentro de la familia es un factor perceptible cuyo rompimiento es compensable. En el pasado hemos considerado que se puede reducir la indemnización a los padres de un menor fenecido por la negligencia del demandado, pues éstos no eran casados ni vivían juntos al momento de ocurrir los hechos. *González v. Municipio de Loíza,* 103 D.P.R. 204 (1975). ¿Por qué no aumentar significativamente la indemnización a los miembros de una familia tan unida y armoniosa como la del caso de autos?

Hace apenas un mes señalábamos en nuestra opinión disidente en parte y de conformidad en parte en *Saurí Rodríguez v. Colón Martínez*, 127 D.P.R. 900, 906 (1991), que:

La cantidad que el foro de instancia concede al perjudicado depende de muchas y variadas circunstancias que concurren en el caso. Entre éstas podemos señalar la gravedad de los daños sufridos, la existencia de sufrimientos (tanto físicos como *mentales*), el ajuste de la compensación a *las realidades sociales* y económicas, la pérdida de ingresos provenientes del trabajo y los altos costos médicos del tratamiento de lesiones.

Estos y otros factores convergen en la valorización que en definitiva obtiene quien acude al foro judicial en busca de justicia e indemnización por el agravio sufrido. (Énfasis suplido.)

En el caso de autos se trata de valorizar los daños mentales de los seres humanos que compartían la realidad social de pertenecer a una familia puertorriqueña extendida pero unificada.[2] Entra en juego y se activa el sentido de justicia de quien valoriza el dolor ante el quebrantamiento de los lazos afectivos, sentimentales y emocionales de este grupo familiar particular.

La determinación de hechos del foro de instancia estipulada por las partes en cuanto al menor codemandante Luis A. Velázquez Umaña fue la siguiente:

El menor condemandante Luis A. Velázquez Umaña, quien nació el 26 de diciembre de 1976, tenía buenas relaciones con su hermanito Richard. Luis tenía 9 años al morir Richard. Practicaban juegos y se divertían juntos; a veces en unión a los demás miembros de la familia. *Sufrió mucho Luis por la muerte de su hermanito y recriminaba por ello a la madre, diciéndole que por qué no lo dejó como estaba. Después de la muerte a veces se pasaba mirando el techo.* Sufrió lo que se espera que sufra un hermano por la muerte

---

[2] Esta realidad la hemos reconocido en otros casos. Así, por ejemplo, en *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443 (1985), concedimos indemnización a los padres, hermanos y abuelos paternos de un menor que quedó inválido por la negligencia de la Autoridad de Energía Eléctrica (A.E.E.). Nótese que allí se concedió quince mil dólares ($15,000) a cada uno de los hermanos del menor y treinta y cinco mil dólares ($35,000) y veinticinco mil dólares ($25,000) al abuelo y abuela, respectivamente, aun cuando dicho menor quedó con vida. ¿Es que acaso la incapacidad permanente debe ser indemnizada con mayor cuantía que la pérdida permanente producida por la muerte?

de otro hermanito, en las circunstancias en que falleció Richard Velázquez Umaña. (Énfasis suplido.)

El sufrimiento de este menor a la temprana edad de nueve (9) años por la pérdida de su hermano, con el cual vivía y tenía relaciones interpersonales excelentes, obviamente le ha causado un trauma de tal naturaleza que "se pasaba mirando al techo" *y, sobre todo, recriminaba a su madre por la muerte de su hermano*. Antes de la muerte de su hermano vivía en un ambiente familiar lleno de cariño, no sólo demostrado a su hermano, sino también a sus padres y hermana. Ese ambiente ha cambiado con la muerte del finado. Por ello, aumentaría su indemnización a veinte mil dólares ($20,000).

La determinación de hechos del foro de instancia *estipulada por las partes* en cuanto a la menor Daisy Velázquez Umaña fue la siguiente:

La menor Daisy Velázquez Umaña, quien nació el 2 de octubre de 1982, y quien es hermana del finado Richard Velázquez Umaña, quería mucho a su hermano. Tenía ella 14 años y medio cuando él murió. *El cariño era más de* lo usual por razón de que Richard nació después de 5 años del nacimiento del otro hermano y vino como a llenar un vacío. *Ella lo atendía en la cuna; a veces "lo dormía en la cama". El le decía "Titi"*. Sufrió ella lo que se espera que sufra una hermana por la muerte de su hermanito, considerando las circunstancias particulares en que falleció Richard Velázquez Umaña. (Énfasis suplido.)

El sufrimiento de esta menor a los catorce (14) años por la pérdida de su hermano con el cual vivía, al cual atendía en forma especial, a la cual el finado le llamaba "Titi" y con la cual tenía unos lazos personales especiales, requieren que proveamos una indemnización mayor. La fijaríamos en veinte mil dólares ($20,000).

La determinación de hechos del foro de instancia *estipulada por las partes* en cuanto a los abuelos fue la siguiente:

Los codemandantes Laureano Velázquez Torres y Marcelina Ortiz Rivera son los abuelos paternos del finado menor Richard Velázquez Umaña. *Viven en un sector cercano al lugar donde*

*residía dicho menor con sus padres. Se relacionaban con él, ya que el niño iba con los padres semanalmente a visitarlos. Era él el último de los nietos.* Cuando el niño murió *lo llevaron a velar a la casa de estos abuelos* y allí ellos *compartieron el dolor con los demás familiares.* Sufrieron ambos por la pérdida de este nieto lo que se espera que sufran unos abuelos al ver perder un nieto, considerando las circunstancias particulares en que falleció Richard Velázquez Umaña. (Énfasis suplido.)

Obsérvese que se trata de unos abuelos que tenían una particular relación con el finado; vivían cerca de él, lo veían semanalmente y el velorio fue en su casa.

*Los abuelos eran parte integrante del núcleo familiar inmediato.* Eran una familia muy unida. Su indemnización la fijaríamos en quince mil dólares ($15,000) a cada uno.

Si bien no existe "computadora electrónica que recoja todos los elementos y premisas inarticulados que nutren la valorización del dolor físico y mental", *Urrutia v. A.A.A.*, 103 D.P.R. 643, 647–648 (1975), nuestro sentido de justicia, conciencia, compasión y sensibilidad humana nos mueve a considerar que en este caso procede una indemnización mayor para los seres humanos que componen este particular grupo familiar como medio de reparar los daños manifiestos ocasionados con la pérdida del pequeño Richard. *Cf. Ruiz Guardiola v. Sears Roebuck*, 100 D.P.R. 817 (1972). Corresponde al humano juez valorar ese dolor. *Cf. Moa v. E.L.A.*, 100 D.P.R. 573 (1972).

Por último, la Universidad de Puerto Rico negó por tres años y medio (31/2) la negligencia. *Su temeridad es patente.* El Hospital Pediátrico está adscrito a la Universidad; los récord médicos del menor siempre estuvieron a su disposición desde el comienzo de su tratamiento. Su conducta hizo necesario un litigio extremadamente largo que pudo incluso evitarse y que obligó a la parte demandante a incurrir en gastos y a sufrir molestias innecesarias. Este es un caso en que la demanda se presentó el 21 de enero de 1986 y la sentencia se dictó el 28 de diciembre de 1990: unos cuatro (4) años después. Tal dilación por temeridad amerita que impongamos diez mil dólares ($10,000) de honorarios de abogado a la Universidad de Puerto Rico.

No podemos tolerar que en casos como éste en que el demandado sabe o debió saber a tiempo que era responsable, éste complique y dilate los procesos judiciales innecesariamente y que la justicia se haga tardíamente. Sobre el impacto de ello en el funcionamiento de los tribunales, véase el Informe Final del Council on the Role of Courts, *The Role of Courts in American Society*: *The Final Report*, Minnesota, Ed. West Publishing Co., 1984.