# 2001 DTA 123

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL DE SAN JUAN
PANEL II**

WILLIAM SANTIAGO AGOSTO Y OTROS
Demandantes-Apelados

v.

CORPORACION FONDO DEL SEGURO DEL ESTADO
Demandado-Apelante

Núm. KLAN-00-00470

San Juan, Puerto Rico, a 15 de febrero de 2001

Panel integrado por su Presidenta, la Juez Alfonso de Cumpiano,
el Juez Aponte Jiménez y la Juez Feliciano Acevedo

Feliciano Acevedo, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

La Corporación del Fondo del Seguro del Estado ("*el Fondo*") apela la sentencia emitida el 9 de marzo de 2000 por el Tribunal de Primera Instancia, Sala Superior de San Juan. Mediante la misma, el foro *a quo* declaró Ha Lugar una demanda en daños y perjuicios presentada por la parte apelada.

Los hechos relevantes al caso de marras son los siguientes.

El 7 de enero de 1996, el apelado William Santiago Agosto se encontraba laborando como carnicero en el Supermercado Grande, de Hato Tejas, Bayamón. Ese día, a las 7:30 a.m., mientras cortaba un pernil de cerdo congelado, sufrió un accidente cuando la máquina que utilizaba para dichas labores le cercenó tres (3) dedos de su mano hábil, la derecha (dígitos segundo, tercero y cuarto, al nivel de la falange distal media). A la fecha de ocurrir el accidente, William tenía veintitrés (23) años de edad.

Inmediatamente después de ocurrido el accidente, el supervisor de William, Sr. Ismael Santiago, quien se desempeñaba como Jefe del Departamento de Carnicería en el referido supermercado, le aplicó un torniquete y ordenó se colocaran los dedos mutilados en un envase con hielo. El Sr. Ismael Santiago, junto a otro empleado del establecimiento, transportó a William al Hospital Hermanos Meléndez, llevando consigo el envase que contenía los dedos. Arribaron al hospital a las 7:45 a.m. En el Hospital Hermanos Meléndez, le ofrecieron los primeros auxilios a William, mas al no tener disponible el equipo necesario para realizar cirugía de mano lo refirieron al Centro Médico de Puerto Rico.

Así las cosas, el Sr. Ismael Santiago trasladó a William al Centro Médico, al cual llegaron a las 8:30 a.m, llevando el envase en el cual se conservaron los dedos cercenados. Ya en la Sala de Emergencias del Centro Médico, William fue primeramente atendido por el Dr. Dueño, quien ordenó que se le tomara una placa de la mano lesionada y se le administraran medicamentos. No obstante, nada se ordenó en cuanto a la conservación de los dedos, aun cuando éstos habían sido transportados al hospital en buen estado, apenas una hora después del accidente. Tampoco se preparó a William para practicarle una cirugía inmediata de re-implantación.

Ese mismo día, a las 9:00 a.m., aproximadamente, el médico de Sala de Emergencias que atendió a William, ordenó llamar a los médicos de la Corporación del Fondo del Seguro del Estado para que éstos se hicieran cargo del caso debido a que el accidente ocurrió durante horas de trabajo. Así, pues, el Dr. Eduardo Córdova, médico generalista del Fondo, llegó al Centro Médico a las 10:00 a.m. y examinó a William. A esa hora, los dedos de éste aún permanecían en el envase con hielo. No obstante, el Dr. Córdova, a pesar de conocer los procedimientos necesarios para la conservación de dedos amputados, no dispuso nada en cuanto al particular, pues para él, ya "*esos dedos no servían*". Este le expresó a William y a los familiares que le acompañaban que los dedos no podían ser "*pegados*". ▓▓

A pesar de haber dicho el Dr. Córdova que los dedos "*no servían*", a las 10:00 a.m. éste ordenó llamar al Dr. Sandy González, reconocido cirujano de mano, capacitado para realizar el procedimiento de re-implantación de dedos, y quien para la fecha del accidente tenía un contrato de servicios profesionales con el Fondo. El propósito de dicha llamada era que el Dr. Sandy González evaluara a William a los fines de determinar si procedía la reimplantación, y que la realizara, de ser ésta viable.

Posteriormente, a eso de las 11:05 a.m., el Dr. Córdova dio instrucciones de admitir a William al Departamento de Cirugía, bajo el cuidado del Dr. Sergio Pérez, cirujano general del Fondo. Cabe destacar que a esa hora aún se mantenía vigente la orden de llamar al Dr. Sandy González. No obstante lo anterior, al llegar el Dr. Sergio Pérez, a las 11:50 a.m., éste canceló, inexplicablemente, la orden de llamar al Dr. Conzález.

Esto sucedió habiendo transcurrido tan sólo cuatro (4) horas y veinte (20) minutos desde el accidente, cuando aún existían altas probabilidades de que pudiesen reimplantarse exitosamente los dedos de William. ▓▓

Es menester destacar que el Dr. Sergio Pérez no estaba capacitado para realizar procedimientos de re-implantación de dedos, hecho que nunca estuvo en controversia en el caso. Sin embargo, éste explicó a William, a los familiares que le acompañaban en el hospital (su madre, padrastro, y su entonces novia, Jessica Avilés) y a su supervisor, Sr. Ismael Santiago, que él mismo le iba a "*pegar*" los dedos e iba a tener movimiento de pinza, creando así expectativas en ellos.

La Sra. Gloria Hernández, tía de Jessica Avilés, también se trasladó al hospital y allí habló personalmente con el Dr. Sergio Pérez. La Sra. Hernández es profesora de Anatomía en el Recinto de Ciencias Médicas de la Universidad de Puerto Rico. Debido a sus conocimientos científicos, ésta le formuló preguntas más específicas al Dr. Pérez en cuanto a los movimientos de los dedos de William, sus arterias y tendones. Este también le indicó a ella que él mismo le practicaría la re-implantación de los dedos a William, y que luego de efectuarse el procedimiento, el joven podría tener movimiento de pinza, entiéndase tocar sus dedos unos con otros.

El Dr. Pérez informó a William y a sus familiares que le realizaría la operación de re-implantación de los dedos el 9 de enero de 1996, dos (2) días después de ocurrido el accidente. Debido a que éstos desconocían que a esa fecha los dedos no servirían para ser re-implantados, ■ éstos quedaron conformes, esperanzados y satisfechos con la explicación ofrecida por el Dr. Pérez, teniendo la seguridad de que el procedimiento se realizaría tal como éste les indicó.

Así las cosas, William fue llevado a sala de operaciones el 9 de enero de 1996, con la seguridad de que el procedimiento que habrían de practicarle era el de re-implantación. Mientras era trasladado a sala de operaciones, William le preguntó al enfermero que lo escoltaba si llevaba consigo los dedos cercenados, respondiendo éste en la afirmativa.

A las 10:00 a.m. de ese día, el Dr. Sergio Pérez sometió a William a un procedimiento de debridación, consistente en la limpieza y cierre de las heridas, y no al procedimiento de re-implantación de los dedos amputados que se le hizo creer tanto a él como a sus familiares que se practicaría, pero el que en esos momentos ya no era viable. Cabe mencionar que William había firmado un documento otorgando su consentimiento para la realización del procedimiento de debridación, sin embargo la descripción del mismo estaba redactada a manuscrito en una letra confusa, y en el idioma inglés, el cual el apelado no habla, ni entiende.

Luego de realizada la operación de limpieza, William se percató de que no le habían re-implantado los dedos. Ante ello se sintió desesperado y procedió a comunicarle a sus familiares lo que había ocurrido. Estos intentaron obtener, infructuosamente, una explicación de parte del personal médico sobre las razones por las cuales no se le practicó la re-implantación. Sin embargo, la única persona que podía ofrecerle una explicación, en cuanto al particular, era el Dr. Pérez, pero éste nunca volvió a hablar con William, ni con sus familiares después de la operación.

De los autos surge que a las 7:15 p.m. del 7 de enero de 1996, día en que ocurrió el accidente, todavía los dedos cercenados eran conservados en hielo en el hospital, y que en la hoja de evaluación pre-anestesia, fechada 8 de enero, constaba que el procedimiento propuesto era el de re-implantación. ■

Al momento de ocurrir el accidente, el salario de William era de $220.00 semanales. Este llevaba seis (6) años, aproximadamente, trabajando como carnicero, y se había graduado recientemente de técnico de refrigeración y aire acondicionado. Había planificado comenzar a ejercer dicho oficio y contraer nupcias, próximamente, con su novia Jessica Avilés. Luego de sufrir el accidente, el apelado quedó con una incapacidad parcial permanente de 59% en sus funciones fisiológicas generales, y una incapacidad total (100%) en cuanto a su mano derecha.

El 20 de mayo de 1996, William, Jessica Avilés (hoy esposa de éste), Catalina Agosto Cabrera (su madre) y Félix Desiderio Lozada (su padrastro) instaron la reclamación de daños y perjuicios del epígrafe contra el Fondo, la Administración de Seguros Médicos de Puerto Rico (ASEM), el Dr. Sergio Pérez y el Dr. Eduardo Córdova.

Alegaron, en síntesis, que los demandados incurrieron en actos de impericia médica al prestarle servicios de salud a William luego de ocurrido el reseñado accidente. Solicitaron compensación por los daños físicos, emocionales, angustias mentales y pérdida de ingresos futuros causados por la alegada negligencia de los profesionales de la salud que lo atendieron, al éstos no re-implantarle o no intentar re-implantarle a William los dedos cercenados luego de hacerles creer que realizarían dicha operación. El 7 de agosto de 1996 fue contestada la demanda. En dicha contestación, la apelante negó responsabilidad por los hechos alegados.

El 3 de abril de 1997, el tribunal de instancia emitió sentencia sumaria parcial desestimando la reclamación instada contra los doctores Pérez y Córdova, por razón de éstos poseer inmunidad contra reclamaciones por impericia profesional debido a su "*status*" como empleados regulares del Fondo, una instrumentalidad del Estado Libre Asociado.

El juicio en su fondo del caso se celebró durante los días 3, 4, 6, y 7 de mayo de 1999. La parte apelada presentó en evidencia los testimonios de las siguientes personas: William Santiago Agosto; Catalina Agosto Cabrera; Félix Desiderio Lozada; Jessica Avilés Hernández; Ismael Santiago, supervisor de William a la fecha del accidente y quien lo trasladó a las diferentes instalaciones médicas donde lo atendieron; Yolanda Hernández Quiñones, suegra de William; y Gloria Hernández Quiñones, tía de la esposa de éste, quien también estuvo presente en el Hospital Industrial mientras William era atendido allí.

Dichos testigos declararon en el juicio, entre otras cosas, que el Dr. Pérez les había informado en el Hospital Industrial que él mismo practicaría la re-implantación de los dedos de William. El foro de instancia confirió entera credibilidad a esas declaraciones, lo que consignó en la sentencia que hoy nos ocupa.

Por la parte apelada testificó, además, el Dr. Miguel Saldaña, especialista en microcirugía de la mano, quien reside y ejerce su profesión en el estado de Texas. Este fue debidamente cualificado como perito por el foro de instancia. En síntesis, el Dr. Saldaña expuso su opinión en cuanto a las probabilidades de éxito de un re-implante de dedos en el caso de William, a la luz de las circunstancias presentes al momento de su ingreso en el Hospital Industrial. Este indicó que de haberse intentado la re-implantación con prontitud, las probabilidades de éxito de dicha operación se encontraban alrededor de un 90%, debido a los siguientes factores: (1) el corte que sufrió William, al haber sido ocasionado por una sierra de cortar carnes, era uno "*limpio*"; (2) los dedos amputados habían sido debidamente conservados; (3) el paciente era joven; (4) no era diabético; (5) no fumaba; (6) ni ingería bebidas alcohólicas.

El Fondo, por su parte, presentó como única prueba pericial, el testimonio del Dr. Sergio Pérez, quien también fue cualificado como perito por el tribunal de instancia. Declaró, además, el Dr. Eduardo Córdova, médico que también atendió a William durante su estadía en el Hospital Industrial. El Dr. Pérez expresó su opinión de que en el caso de William, contrario a lo expresado por el perito Dr. Saldaña, las probabilidades de que un procedimiento de re-implantación de dedos resultara exitoso, fluctuaban entre cero y ocho porciento (0-8%), pues el corte sufrido no era "*limpio*". Expresó que por dicha razón procedió a practicarle una debridación al paciente. Además testificó que nunca le expresó a William, ni a sus familiares, que le realizaría a éste una re-implantación de dedos.

En fecha 9 de marzo de 2000, el foro de instancia emitió la sentencia apelada. Mediante la misma declaró Ha Lugar la demanda incoada contra el Fondo, desestimó la reclamación instada contra ASEM, y ordenó al primero el pago de las siguientes cantidades a los fines de compensar en daños y perjuicios a la parte apelada: $100,000.00 por los daños físicos y emocionales, sufrimientos y angustias mentales ocasionados a William por las actuaciones negligentes de la apelante, más $266,998.00 por concepto de pérdida de ingresos; $20,000.00 a la Sra. Catalina Agosto por sus sufrimientos y angustias mentales; $10,000.00 por concepto de sufrimientos y angustias mentales al Sr. Félix Desiderio; y $15,000.00 a la Sra. Jessica Avilés por igual concepto. Se impuso, además, el pago de costas y $5,000.00 por concepto de honorarios de abogado.

El 24 de abril de 2000, la apelante presentó el recurso que nos ocupa, mediante el cual solicitó la revocación de la sentencia antes reseñada e imputó al foro de instancia la comisión de los siguientes errores:

*"1. Erró el Honorable Tribunal al conceder lucro cesante tratándose de una incapacidad parcial permanente de la mano derecha, ausente prueba pericial demostrativa de falta de capacidad en el desempeño del trabajo habitual o en el desempeño de otro de distinta naturaleza o ausencia de destrezas transferibles a otra ocupación con ingresos igual, mayor o mayor (sic) al devengado en el momento del accidente.*

*2. Erró el Honorable Tribunal al no admitir en evidencia las placas de Rayos X de la mano derecha del Sr. Santiago y el escrito del autor Tubiana, ambos sometidos en evidencia, ello sin que mediara objeción de parte y sin determinación denegatoria del Tribunal.*

*3. Erró el Honorable Tribunal (sic) al determinar que la Corporación del Fondo del Seguro del Estado incurrió en negligencia: 1) A base del testimonio del doctor Saldaña, perito cirujano de mano, de la parte demandante, el cual carece de confiabilidad y validez científica; y 2) Al no considerar la Nota de Admisión del Dr. Sergio Pérez, Exhibit II a la página 100, la cual fue leída por el Dr. Saldaña, admitiendo su contenido.*

*4. Erró el Honorable Tribunal al estimar temeridad."*

Posteriormente, la apelada presentó su alegato. Luego de varios trámites procesales, las partes sometieron a este Tribunal una exposición narrativa estipulada de la prueba que desfiló ante el foro de instancia (E.N.P.). El 20 de octubre de 2000, la apelante solicitó a este foro se ordenara al tribunal primario elevar las placas de la mano derecha que le fueron tomadas a William luego del accidente. Estas fueron admitidas en evidencia por el tribunal *a quo* como parte del expediente médico del paciente. Finalmente, el 11 de enero de 2001, este foro apelativo emitió resolución a dichos fines. En fecha 31 de enero de 2001, recibimos las referidas placas, hoy constituyendo estas parte de los autos del presente caso.

Examinada la totalidad del expediente, el derecho aplicable y con el beneficio de la comparecencia de ambas partes procede disponer del presente recurso de apelación.

## I

En su Escrito, la apelante objeta la conclusión del Tribunal de Primera Instancia en cuanto a que ésta incurrió en negligencia al prestar servicios de salud al apelado William Santiago Agosto luego de ocurrido el accidente que ocasionó a éste la amputación de tres de los dedos de su mano derecha. Entendemos que procede analizar primeramente dicho señalamiento.

El Artículo 1802 de nuestro Código Civil establece las bases jurídicas de la responsabilidad civil extracontractual. Dicho articulado dispone que aquél que por acción u omisión cause daño a otro, interviniendo culpa o negligencia, viene obligado a reparar el daño causado. Es sabido que una persona actúa negligentemente cuando falta al debido cuidado que impone la ley, es decir, cuando no prevé o anticipa las consecuencias racionales de sus actos o la omisión de un acto, como lo haría una persona prudente y razonable bajo las mismas circunstancias. *Ramos v. Carlo*, 85 D.P.R. 353 (1962).

De este modo, el actor habrá incurrido en el quebrantamiento de su deber de cuidado si anticipó o debió anticipar el peligro de daños si se concluye que un hombre prudente y razonable hubiese podido prever tales consecuencias. H.M. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, **Publicaciones J.T.S.**, San Juan (1986), a la pág. 184. Este deber de previsibilidad, sin embargo, no se extiende a todo peligro imaginable, sino a aquel daño que es probable que ocurra. *Vélez Rodríguez v. Amaro Cora*, 138 D.P.R. 182 (1995).

En resumen, para determinar la negligencia que corresponde a cada parte, es necesario analizar y considerar

todos los hechos y circunstancias que mediaron en el caso, y particularmente si ha habido una causa predominante. Véase Brau del Toro, a la pág. 412.

Cuando una reclamación de daños y perjuicios se basa en alegaciones de impericia médico-hospitalaria, existe una presunción de que el médico le ofreció un tratamiento adecuado a su paciente, por lo que los reclamantes tienen el peso de la prueba para rebatirla. *Crespo v. Hernández*, 121 D.P.R. 639 (1988). Así, pues, para que prospere una acción de dicha naturaleza, se debe establecer, mediante preponderancia de la prueba, que la conducta negligente del proveedor del servicio profesional fue el factor que con mayor probabilidad causó el daño y que dicha conducta no estuvo a la altura de las normas mínimas de conocimiento y cuidado aplicables. *Núñez v. Cintrón*, 115 D.P.R. 598 (1984); *Zambrana v. Hospital*, 109 D.P.R. 517 (1980).

Del mismo modo, un hospital que brinda servicios de salud con un personal que no actúa con la debida diligencia, puede también generar una acción bajo el Art. 1803 de nuestro Código Civil, 31 L.P.R.A. sec. 5142, y ser responsable por los actos negligentes de sus médicos y enfermeras cuando dichos actos u omisiones causen un daño real. *Soto Cabral y otros v. E.L.A.*, 138 D.P.R. 298 (1997); *Núñez v. Cintrón, supra*.

En relación a la culpa o negligencia por parte de los facultativos y personal de salud de los hospitales, se entiende que constituye culpa *"la omisión de la diligencia exigible mediante cuyo empleo podría haberse evitado el resultado dañoso"*. C. Rogel Vide, *La Responsabilidad Civil Extracontractual*, Ed. Civitas, 1976, pág. 90. Esa diligencia es la que cabe esperarse de un buen padre de familia y, a diferencia de la culpa que requiere la ejecución de un acto positivo que causa daño, la negligencia es una omisión que produce el mismo efecto. *Toro Aponte v. E.L.A.*, 142 D.P.R. __ (1997), **97 J.T.S. 18**, pág. 627.

En Puerto Rico, la doctrina adoptada en torno a las normas mínimas de atención médica al amparo del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, es que se espera que el médico y las enfermeras que ofrecen sus servicios profesionales, le brinden a sus pacientes la atención, cuidado y destrezas que estén acordes con los modernos medios de comunicación, enseñanza y estado de la ciencia y prácticas prevalecientes en la medicina y que satisfagan, de esta manera, las exigencias generalmente reconocidas por su profesión. *Santiago Otero v. Méndez,* 135 D.P.R. 540 (1994); *Ramos Robles v. García Vicario*, 134 D.P.R. 969 (1993).

En síntesis, en nuestro ordenamiento jurídico, la norma es que todo médico tiene el deber de prestar a sus pacientes servicios de excelencia. Si él no puede hacerlo, su deber de previsibilidad demanda que lo refiera a otro médico que pueda ofrecerle la atención que el paciente requiere. Así, pues, toda vez que existe una presunción de que se ha ejercido un grado razonable de cuidado y que se ha brindado un tratamiento médico-hospitalario adecuado, en los casos de impericia médico-hospitalaria, le corresponde al demandante demostrar con preponderancia de la prueba que el tratamiento médico-hospitalario, o la ausencia de un tratamiento adecuado, fue el factor que con mayor probabilidad causó el daño alegado por el paciente. En consecuencia, en la parte demandante recae el peso de demostrar que el tratamiento médico-hospitalario suministrado no fue el correcto y que no es por mera especulación o conjetura que llegó a la conclusión de que el acto negligente médico-hospitalario es la causa del daño sufrido. *Soto Cabral y otros v. E.L.A., supra,; Santiago Otero v. Méndez, supra.*

A la luz de la normativa antes expuesta y luego de analizar la sentencia, los alegatos de las partes, sus correspondientes Apéndices y la exposición narrativa estipulada de la evidencia desfilada ante el foro de instancia, concluimos que éste no incidió al determinar que la apelante violó el deber de cuidado y diligencia que le requería nuestro ordenamiento al ofrecer servicios de salud al apelado William Santiago Agosto. Veamos porqué.

En el caso de autos, la evidencia pericial sometida por ambas partes concuerda en la teoría de que cuando una persona sufre una lesión que ocasiona la amputación de dedos de sus manos, es viable practicar la re-implantación de los dígitos afectados si el corte sufrido resulta ser uno *"limpio"*. Esto significa que los dedos

lesionados no han quedado triturados, ni sus tendones, nervios o arterias desgarrados de raíz. Surgió también como hecho incontrovertido que el período de preservación de unos dedos amputados se estima entre unas seis (6) a doce (12) horas. ■

La evidencia pericial sometida al tribunal de instancia por la parte apelada, mediante la presentación del testimonio del microcirujano, Dr. Miguel Saldaña, apunta que la lesión sufrida por William no dejó triturados los dedos que resultaron afectados, ni dejó sus tendones, nervios y arterias desgarrados o truncados de raíz, o sea, que el corte experimentado fue uno relativamente "*limpio*". Ello, en combinación con el factor de que los dedos amputados fueron colocados en un envase con hielo tan pronto ocurrió el accidente y luego transportados al hospital junto con el paciente, habiendo transcurrido menos de una (1) hora de sufrida la lesión, propició que existiera un noventa por ciento (90%) de probabilidades de que los dígitos fueran re-implantados exitosamente. Al estimarse entre seis (6) y doce (12) horas el tiempo de conservación de los dedos cercenados, debió haberse practicado la re-implantación o intentado practicarla dentro de dicho período.

De acuerdo a la prueba pericial presentada por el Dr. Saldaña, en el caso de William resultaba aún más recomendable la re-implantación de los dígitos lesionados, dado que al resultar amputados tres (3) dedos de su mano hábil quedaría dicha mano totalmente incapacitada, no funcional, de no realizarse la operación. Además, las circunstancias de William, al éste ser una persona joven que no ingería bebidas alcohólicas, no fumaba, ni era diabético, resultaban favorables para la consecución de una re-implantación exitosa de los dedos afectados. Así, pues, de habérsele practicado la re-implantación, la recuperación de la mano lesionada se hubiese completado dentro de un plazo entre seis (6) meses a un (1) año. Esta teoría del Dr. Saldaña le mereció entero crédito al foro apelado.

Sin embargo, al arribar el apelado William Santiago al Hospital Industrial, el equipo de profesionales de la salud que allí le atendió, no empleó la debida diligencia al ofrecerle sus servicios, obviando tomar las medidas requeridas para la debida conservación de los dedos cercenados, aun cuando ya el Dr. Eduardo Córdova había decidido contactar al microcirujano, Dr. Sandy González, para que éste evaluara al paciente y procediera a practicarle una re-implantación. Dicha determinación del tribunal de instancia está avalada por las constancias de la exposición narrativa de la prueba de la cual surge que los familiares de William, ante las expresiones del personal médico del hospital de que no le podían proporcionar hielo para conservar los dedos amputados, tuvieron que hacerse cargo de la preservación de los mismos yendo a buscar hielo a un negocio de comidas rápidas cercano al lugar.

De otra parte, en su Escrito de Apelación, el Fondo planteó que el tribunal *a quo* incidió al acoger la teoría del Dr. Saldana de que en el caso de William procedía una re-implantación. Alegó que el testimonio de dicho perito carecía de validez científica y de confiabilidad. Así, pues, nos solicitó revocar la determinación del foro apelado, basada la misma en la teoría del Dr. Saldaña. En apoyo de su solicitud, sometió a nuestra consideración varias páginas del tratado médico "*The Management of Hand Wound*" de Raoul Tubiana, el cual, según la apelante, contradice lo expuesto por el perito Saldaña. Analicemos, pues, este planteamiento.

Como anteriormente expresamos, la teoría pericial ofrecida por el Dr. Saldaña fue acogida por el tribunal de instancia, dado que el testimonio de éste le mereció entera credibilidad. La misma estuvo además sustentada por lo consignado en relación a dicha materia en el tratado médico "*Microvascular Problems*" de James W. Strickland, en su Cap. 28, "*A Rational for Digital Salvage*", el que fue admitido en evidencia.

La Regla 43.2 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, en lo pertinente dispone:

"*...las determinaciones de hechos basadas en testimonio oral, no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos...*".

Cónsono con lo anterior, nuestro Tribunal Supremo ha sostenido que las determinaciones de los tribunales de instancia deben ser objeto de deferencia, en ausencia de circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto. *Belk Arce v. Martínez,* Opinión de 30 de junio de 1998, **98 J.T.S. 92**; *Cooperativa de Seguros Múltiples v. Lugo,* 136 D.P.R. 203 (1994); *Benítez Guzmán v. García Merced,* 126 D.P. R. 302 (1990); *Riley v. Rodríguez Pacheco,* 119 D.P.R. 762 (1987); *Pueblo v. Miranda Ortiz,* 117 D.P.R. 188 (1986); *Pérez Cruz v. Hospital La Concepción,* 115 D.P.R. 721 (1984).

Asimismo, en aquellos casos en los cuales el juzgador haga determinaciones al amparo del poder discrecional que le confiere un estatuto o regla, éstas deberán ser respetadas por los foros apelativos, a menos que se demuestre arbitrariedad, un craso abuso de discreción, una determinación errónea que cause grave perjuicio a una de las partes, o la necesidad de un cambio de política pública procesal o sustantiva. Cf. *Ex Parte Valencia,* 116 D.P.R. 909 (1986); *Lluch v. España Service Sta.,* 117 D.P.R. 729 (1986); *Ortiz Rivera v. Agostini,* 92 D.P.R. 187 (1965).

Dicha deferencia tiene base en el hecho de que los jueces de instancia están en mejor posición que los foros apelativos para aquilatar la evidencia que desfila en los procedimientos ante sí. *Pueblo v. Collado Justiniano,* Sentencia de 29 de febrero de 1996, **96 J.T.S. 23**; *Pueblo v. Miranda Ortiz,* 117 D.P.R. 188 (1986); *Pueblo v. Cruz Granados,* 116 D.P.R. 3 (1984); *Pueblo v. Pagán Díaz,* 111 D.P.R. 608 (1981).

Así las cosas, los tribunales apelativos no deben intervenir en las determinaciones de los foros de instancia sobre el trasfondo fáctico de un caso, salvo en las circunstancias antes mencionadas, ni sustituir por el propio, el criterio del juzgador ante quien declararon los testigos y quien tuvo la oportunidad de apreciar su *"demeanor".* *Sánchez Rodríguez v. López Jiménez,* 116 D.P.R. 172 (1985); *Pérez Cruz v. Hospital La Concepción, supra*; *Vélez v. Secretario de Justicia,* 115 D.P.R. 533 (1984); *Ramos Acosta v. Caparra Dairy, Inc.,* 113 D.P.R. 357 (1982).

De otro lado, la regla general en cuanto a la presentación de prueba pericial ante los tribunales, apunta que: (1) el juzgador de los hechos no está obligado a aceptar las conclusiones de un perito; (2) los tribunales apelativos están en la misma posición que los foros primarios para evaluar y dirimir los conflictos entre las autoridades opuestas sobre controversias periciales médicas; (3) cuando la determinación de los foros de instancia se basa en prueba pericial y documental, los tribunales apelativos están en la misma posición que los tribunales de instancia para evaluar y llegar a sus propias conclusiones de derecho; y (4) al cumplir con su función revisora en casos de impericia médica, la decisión de los foros revisores debe estar fundada en la prueba vertida en el juicio por los peritos y en la prueba documental. *Ramos Robles v. García Vicario, supra; Pueblo v. Marcano Pérez,* 116 D.P.R. 917 (1986); *Cruz v. Centro Médico de P.R,* 113 D.P.R. 719 (1983).

No obstante lo anterior, es también principio jurídico sostenido que en ausencia de prueba, no es función de los foros revisores establecer, a nivel apelativo, los elementos requeridos por el Art. 1802 del Código Civil. Por lo tanto, no podemos sustituir el criterio de los peritos-médicos que declararon en el juicio a base de un estudio apelativo de la literatura disponible. *Santiago Otero v. Méndez, supra; Ruiz Ríos v. Mark,* 119 D.P.R. 816 (1987).

Al tenor de dichas normas, hemos acordado no intervenir con la determinación del foro de instancia en cuanto a que la re-implantación sí era viable en el caso de William. Dicho tribunal, en el sano ejercicio de su discreción, acogió la opinión del perito Dr. Saldaña luego de cualificarlo debidamente como tal y rechazó la del Dr. Sergio Pérez. Así, pues, habiendo estado dicho foro en mejor posición para aquilatar toda la prueba desfilada ante sí y observar el *"demeanor"* de ambos peritos, este foro apelativo ha acordado no interferir con su determinación en cuanto a este particular. Por ende, adoptamos también dicha teoría en cuanto a cuál era el curso de acción adecuado que debió seguir el personal médico del Fondo al prestar sus servicios a William, a la luz del cuadro clínico de éste y del estado de la ciencia y de la práctica prevaleciente de la medicina.

Refuerza nuestra conclusión el hecho de que la apelante presentó en el juicio, como única prueba pericial, el testimonio del propio Dr. Pérez a los fines de refutar la opinión del Dr. Saldaña. Este médico, a pesar de tener experiencia realizando cirugías de mano en el Hospital Industrial, no posee la capacitación necesaria para practicar un procedimiento de re-implantación de dedos, ni ha realizado ninguno durante el tiempo que lleva practicando su profesión.

Así, pues, contra el testimonio del perito Saldaña, con extensa experiencia en el campo en cuestión, avalado el mismo por literatura médica sobre el tema de reimplantación de dedos, y ante la ausencia de prueba pericial de otro médico con igual o mayor preparación que dicho microcirujano que refutara la teoría adoptada por el foro de instancia, resulta improcedente alterar su determinación.

No resulta razonable intervenir con la decisión del foro primario, acogiendo nosotros la teoría del doctor Sergio Pérez, cirujano general, sin estudios especializados en microcirugía, cuando es un hecho fuera de toda controversia que éste no demuestra el dominio de la especialidad que requería el caso de William, ni estaba capacitado para practicarle una re-implantación de dedos. Véase *Ríos Ruiz v. Mark, supra.* Más aún, no corresponde a este Tribunal, en su función revisora, sustituir el criterio del foro de instancia, analizando la literatura médica que somete a nuestra consideración la apelante. Además, en este caso no concurren circunstancias extraordinarias, ni indicios de pasión, prejuicio o error manifiesto que justifiquen alterar la determinación de dicho tribunal en cuanto a este particular.

En vista de lo anterior, llegamos a la conclusión de que el curso de acción de los profesionales de la salud que atendieron a William en el Hospital Industrial fue irrazonable y que el mismo se apartó de la norma de diligencia requerida por nuestro ordenamiento a quienes prestan servicios médicos a un paciente. En el caso de marras, los servicios prestados no estuvieron a la altura de los principios mínimos de cuidado y diligencia.

A la luz de lo antes expuesto, no nos convence el alegato que intenta en el fondo esbozar la apelante de que el Dr. Sergio Pérez no actuó negligentemente al cancelar la orden de llamar al Dr. Sandy González, quien sí estaba apto para realizar el procedimiento en cuestión, debido a que su propia evaluación del caso del paciente le llevó a concluir que dicho procedimiento no era factible. Este médico faltó a su deber de diligencia ante la situación de emergencia de William, pues al no estar capacitado para realizar el procedimiento de re-implantación, debió referir a su paciente a un médico especialista que sí pudiera ofrecerle la atención que su condición requería. Su deber de previsibilidad le requería hacer dicha gestión.

En adición, tampoco puede considerarse razonable el curso de acción del Dr. Pérez, al hacerle creer a William y a sus familiares que él mismo llevaría a cabo la re-implantación en fecha 9 de enero de 1996, dos (2) días después de ocurrido el accidente. Dicha conducta les creó falsas expectativas debido a que ellos desconocían que este médico no estaba capacitado para realizar la operación, y que para la fecha propuesta, ésta ya no era viable, dado el corto período de preservación que tienen los dedos amputados. ██ Más aún, dicho médico, luego de practicar la debridación al paciente, ni siquiera volvió a comunicarse con éste, ni a examinarlo.

No obstante, en su Escrito, la parte apelante aduce que el Dr. Pérez nunca expresó a William, ni a sus familiares que le practicaría la re-implantación, a pesar de que en la sentencia apelada el tribunal de instancia expuso en sus determinaciones de hechos que el Dr. Pérez incurrió en dicha conducta. Este foro consignó expresamente que le mereció entero crédito el testimonio de William, y sus familiares en cuanto a ese particular.

Así, pues, a la luz de las disposiciones de la Regla 43.2 de las de Procedimiento Civil y la jurisprudencia relacionada, no procede alterar la conclusión del foro de instancia de que el Dr. Sergio Pérez informó a la parte apelada que el 9 de enero de 1996, él mismo realizaría la re-implantación. En este caso no se interponen asomos de pasión, prejuicio, parcialidad o manifiesto error que lo justifiquen.

En conclusión, recalcamos que no incidió el foro de instancia al determinar que incurrió en negligencia el personal médico que atendió al apelado William Santiago Agosto durante su estadía en el Hospital Industrial luego de ocurrido su accidente. Estos profesionales de la salud no emplearon la debida diligencia en su caso, ni rindieron al paciente los servicios de excelencia que requiere nuestro ordenamiento en materia de responsabilidad por mala práctica de la medicina. De éstos haber sido diligentes, se hubiesen evitado las consecuencias dañosas que sufrió William por no serle re-implantada la mayor parte de los dedos de su mano hábil.

Al ser dichos profesionales de la salud empleados de la apelante, la Corporación del Fondo del Seguro del Estado, ésta resulta vicariamente responsable por sus actos, en virtud de las disposiciones del Artículo 1803 de nuestro Código Civil, *supra*. Le corresponde entonces a ésta compensar a la apelada por los daños que sufriera, los cuales fueron evidenciados ante el Tribunal de Primera Instancia.

## II

En su escrito, la apelante señala que el foro de instancia incidió *"al no admitir en evidencia las placas de Rayos X de la mano derecha del Sr. Santiago y el escrito del autor Tubiana, ambos sometidos en evidencia, ello sin que mediara objeción de parte y sin determinación denegatoria del Tribunal"*. Del examen del expediente y específicamente de la exposición narrativa estipulada de la prueba desfilada ante el tribunal apelado, se desprende que ambos documentos sí fueron admitidos en evidencia por dicho foro, por lo que no encuentra apoyo en los autos del caso el referido planteamiento. Véase E.N.P., págs. 79, 81, 86 y 87.

Ciertamente, dicha evidencia fue sometida ante la consideración del tribunal *a quo* y admitida por éste. Nada sostiene la alegación de la apelante de que el foro primario denegara su admisión. El mero hecho de que dichos documentos no fueran relacionados por el foro de instancia en la sentencia apelada, no es indicativo de que éste no los considerara al emitir su determinación. Así, pues, el referido señalamiento de error resulta inmeritorio.

## III

La apelante también objeta la concesión de una partida por concepto de lucro cesante al apelado William Santiago Agosto. Aduce que ello no procedía al consistir de una incapacidad parcial permanente la condición con que éste resultara. Señala que no se presentó prueba pericial que demostrara que el apelado no está capacitado para laborar en otros empleos diferentes al que tenía al momento de ocurrir el accidente.

El lucro cesante se trata de un perjuicio sufrido, consistente en una ganancia futura frustrada que con cierta probabilidad era de esperar según el curso normal, ulterior de las cosas. El perjudicado no tiene que demostrar con certeza absoluta que se habrían realizado las ganancias, sino que basta establecer la probabilidad -no la mera posibilidad- de una ganancia futura, teniendo en cuenta que tal vez en algún caso, sea indemnizable la mera posibilidad. *Ruiz Santiago v. E.L.A.,* 116 D.P.R. 306 (1985).

Así, pues, el lucro cesante se compone propiamente de la pérdida de ingresos ocasionada al perjudicado y la disminución de su capacidad productiva. De este modo, a los fines de establecer el lucro cesante como un elemento de daños compensables, al demandante le corresponde establecer la pérdida de ingresos hasta la fecha de la vista de la causa y la disminución de su capacidad productiva. *Rodríguez v. Ponce Cement Corp.,* 98 D.P. R. 201 (1969).

Aún cuando no existe una regla fija para estimar el importe de la disminución en la capacidad productiva de un demandante en una acción bajo el Art. 1802 del Código Civil, *supra*, en su intento de probar lucro cesante como un elemento de daños, éste debe poner en condiciones al juez sentenciador para hacer las siguientes determinaciones básicas: (a) la extensión de la mengua en la capacidad productiva que, ordinariamente, se establece mediante una comparación de la habilidad para obtener ingresos antes y después del accidente; (b) la determinación de los efectos de la disminución, si transitoria o permanente, y (c) la fijación de la suma que

**181**

compensa por esta disminución, considerando tanto su extensión como sus efectos, incluyendo la actualización de la pérdida (present net worth). *Vda de Delgado v. Boston Ins. Co.,* 99 D.P.R. 714 (1971); *Rodríguez v. Ponce Cement Corp., supra.*

A la luz de la normativa antes expuesta, entendemos que no le asiste la razón al apelante. A la fecha de ocurrir el accidente, el apelado, William Santiago Agosto, se dedicaba al oficio de carnicero, mediante el cual generaba ingresos ascendentes a $220.00 semanales. Existía la probabilidad de que durante el resto de su vida, éste continuara laborando en el mismo empleo y obteniendo dichas ganancias. Más aún, existían altas probabilidades de que comenzara a ejercer el oficio de técnico de refrigeración y aire acondicionado, del cual se había graduado poco antes de sufrir la lesión en su mano derecha. De haberle sido re-implantados los dedos cercenados, se hubiera completado el procedimiento de recuperación de su mano hábil dentro de un período de seis (6) meses a (1) año.

No obstante, a consecuencia del reseñado accidente y de las actuaciones negligentes de la apelante, William sufrió una incapacidad parcial permanente de 59% en sus funciones fisiológicas generales, quedando su mano hábil, la derecha, totalmente incapacitada, hecho que se evidenció ante el tribunal *a quo*. Ello tuvo como resultado, una merma en su capacidad productiva, y, por lo tanto, en sus ganancias, ▮ pues ya no le es posible ejercer dichos oficios con las mismas destrezas que poseía antes de lesionarse, dado que las tareas inherentes a ambos quehaceres son de naturaleza esencialmente manual. Por ende, William tiene derecho a obtener compensación por los ingresos que no generará como resultado de la negligencia de la apelante.

## IV

Procede entonces entrar en los méritos del cuarto señalamiento de error esbozado por la apelante. Esta cuestiona el curso de acción del foro de instancia al imponerle el pago de honorarios de abogado.

La Regla 44.1 de las de Procedimiento Civil dispone lo siguiente en cuanto al particular:

*"(a) ...*

*(d) Honorarios de abogado. En caso que cualquier parte haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable, el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta."* ▮

Se desprende de dicha disposición que la concesión de honorarios de abogado no se percibe en nuestro ordenamiento como un premio a la parte victoriosa en un litigio, sino, más bien, como una sanción dirigida a una parte que con su actitud temeraria ha actuado en forma irrazonable o extremadamente litigiosa, afirmando hechos o conduciéndose sin fundamentos o motivos, *"con conciencia de la propia sin razón"*. *Feliciano v. Feliciano,* Op. de 17 de marzo de 1999, **99 J.T.S. 23.** De este modo, se entiende que un litigante es frívolo cuando sus argumentos o su curso de acción en un pleito, no tienen razón de ser, méritos, peso o lógica alguna. *Departamento de Recreación y Deportes v. Asociación Recreativa Round Hill, Inc.,* Op. de 19 de agosto de 1999, **99 J.T.S. 138.**

En Feliciano, el Tribunal Supremo expresó que la imposición de honorarios de abogado procede únicamente cuando una parte manifiesta una actitud obstinada que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia, sujetando al litigante inocente a la ordalía del proceso judicial y exponiéndolo a gastos innecesarios y a la contratación de servicios profesionales, incluyendo abogados, con el gravamen a veces exorbitante para su peculio. Por el contrario, cuando no existe una actitud temeraria, los tribunales no pueden condenar al pago de honorarios por el mero hecho de que una parte no ha resultado victoriosa.

En fin, el objetivo de la norma jurídica que permite la imposición de honorarios de abogado por temeridad

es castigar a aquel litigante perdidoso que, por su terquedad, obstinación, frivolidad o insistencia -en actitud desprovista de fundamentos-, obliga a la parte contraria a asumir innecesariamente las molestias, gastos e inconvenientes de un pleito. *Departamento de Recreación y Deportes v. Asociación Recreativa Round Hill, Inc., supra; Velázquez Ortiz v. Universidad de Puerto Rico,* 128 D.P.R. 234 (1991); *Santos Bermúdez v. Texaco P.R.,* 123 D.P.R. 351 (1989); *Fernández v. San Juan Cement Co., Inc.,* 118 D.P.R. 713 (1987).

Cabe destacar que la imposición de honorarios de abogado es prerrogativa discrecional de los tribunales de instancia, pero determinada la temeridad, su imposición es mandatoria. Véase *Raluan Corp. v. Feliciano,* 111 D.P.R. 598 (1981); *Montañez Cruz v. Metropolitan Constr. Corp.,* 87 D.P.R. 38 (1962).

El Tribunal Supremo ha resuelto que existe temeridad cuando, por los actos de una parte, se hace necesario un pleito que se pudo evitar; se prolonga un pleito innecesariamente; o se produce la necesidad de que otra parte incurra en gestiones evitables. *Feliciano v. Feliciano, supra.* A modo de ejemplo, nuestro más alto foro judicial en dicha opinión, manifestó que constituyen actuaciones temerarias las siguientes: cuando el demandado contesta la demanda y niega su responsabilidad total, aunque la acepte posteriormente; cuando se defiende injustificadamente de la acción que se presenta en su contra; cuando no admite francamente su responsabilidad limitada o parcial, a pesar de creer que la única razón que tiene para oponerse a la demanda es que la cuantía es exagerada; cuando se arriesga a litigar un caso del que *prima facie* se desprende su negligencia; o cuando niega un hecho que le consta ser cierto.

Del curso de acción de la apelante en el caso de marras, surge que no fue irrazonable la determinación del foro de instancia de imponerle el pago de honorarios de abogados. La Corporación del Fondo del Seguro del Estado, desde la contestación de la demanda del epígrafe hasta el presente, ha negado responsabilidad por los actos de sus empleados, aun cuando de los hechos que provocaron la reclamación, se aprecia la conducta negligente de éstos, la cual fue previamente descrita. Así las cosas, en este caso no concurren circunstancias especiales que nos muevan a intervenir con el curso de acción del foro apelado al ejercitar su sana discreción determinando que la apelante incurrió en temeridad durante el presente litigio.

Por los fundamentos antes expuestos, se confirma la sentencia apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

## ESCOLIOS 2001 DTA 123

**1.** Véase Sentencia de 9 de marzo de 2000, Apéndice del Escrito de Apelación, a la pág. 166 A.

**2.** El Tribunal de Instancia, en la sentencia apelada, expresó que aun cuando los dedos amputados habían sido colocados por el supervisor Santiago en un envase y estaban en contacto directo con hielo "*quedó convencido por lo aseverado por el perito de la parte demandante de que aún podían ser utilizados, de haberse tomado las medidas estándares para su conservación, aun luego de transcurridas varias horas luego del accidente*".

**3.** De la prueba pericial desfilada ante el tribunal de instancia, surge que unos dedos amputados tienen un período de preservación de sólo seis (6) horas, a temperatura ambiente, hasta doce (12) horas, en un envase con hielo y agua, a los fines de ser utilizados en un procediniento de re-implantación.

**4.** Véase Sentencia de 9 de marzo de 2000, Apéndice del Escrito de Apelación, a la pág. 168.

**5.** Seis (6) horas a temperatura ambiente y hasta doce (12) horas en un envase con hielo y agua.

**6.** Es de notar, además, que en el documento de evaluación pre-anestesia fechado 8 de enero de 1996, un (1) día después

del accidente, se consignó que el proceso a realizársele a William sería el de re-implantación y no el de debridación, cuando ya para esa fecha, el mismo no era viable. Más aún, los dedos amputados fueron enviados junto al paciente a sala de operaciones el 9 de enero de 1996.

7. Cabe mencionar que luego de ocurridos los hechos que originan la demanda del epígrafe, William permaneció tres (3) años sin poder trabajar debido a que la propia apelante le ordenó recibir tratamiento en descanso.

8. 32 L.P.R.A. Ap. III, R. 44.1 (d).