El Juez Asociado Señor Martínez Torres
emitió la opinión del Tribunal.
Este caso nos permite pautar, por primera vez, que cuando un tribunal adjudique responsabilidad en un pleito de daños y peijuicios, debe incluir en su sentencia la por- *893 ción de responsabilidad de todas las partes demandadas. Hay que hacerlo aunque algunos codemandados hayan lle-gado a una transacción confidencial con los demandantes. De igual forma, de concluirse que alguno de los codeman-dados no tiene responsabilidad, también debe hacerse constar.
Por otro lado, concluimos que cuando un demandado que permanece en un pleito de daños y perjuicios interesa que se revisen los efectos de un acuerdo de transacción confidencial que relevó a otros deudores solidarios, debe tomar acción conforme a las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. V, antes de que la sentencia de desestima-ción advenga final y firme.
Por último, aclaramos cómo debe computarse la com-pensación por daños, a la luz del precedente más reciente sobre ese tema.
I
Jesús Manuel Rodríguez Rodríguez tenía 28 años cuando comenzó a sufrir un viacrucis que se extendió du-rante cinco meses, mientras buscaba un tratamiento que le salvara la vida. La búsqueda resultó infructuosa. Falleció el 16 de marzo de 2005. Padecía de obesidad mórbida, re-flejada en sus 400 libras de peso, hipertensión, diabetes y asma bronquial.
El 12 de octubre de 2004 Jesús Manuel acudió a la ofi-cina del Dr. Oscar Hernández, su médico primario, porque le aquejaba un dolor en el lado derecho del abdomen. El galeno diagnosticó una infección en la orina y le dio de alta. Los dolores no cesaron. Diez días después, Jesús Manuel acudió a la sala de emergencias del Hospital Dr. Su-soni en Arecibo. Se le evaluó y dio de alta con medica-mentos.
Sin embargo, al día siguiente regresó. Un cirujano or-denó un CT abdomino-pélvico, pero no se pudo realizar *894 porque la sala de emergencias del Hospital Dr. Susoni no contaba con el equipo para ello. Lo refirieron al Hospital Universitario, en el Centro Médico de Río Piedras, porque requería cirugía y en la institución arecibeña no se atre-vían a intervenirle por su compleja condición de salud.
La certificación médica de traslado para el Centro Mé-dico indicaba que la razón de la transferencia era una con-dición quirúrgica, a raíz de un diagnóstico de dolor abdominal. Además, daba cuenta de que el Hospital Dr. Susoni no tenía los recursos para estabilizar al paciente, hacer el diagnóstico adecuado y proveer el tratamiento es-pecializado que requería. Por eso, se consideró más benefi-cioso enviarle al Centro Médico, aunque el traslado conlle-vara entre sus riesgos, un deterioro de la condición y una perforación.
En el Hospital Universitario no hicieron el CT abdomino-pélvico. Tampoco le operaron. Optaron por tra-tarle por una infección en la orina. Estuvo allí tres días sin que se le ubicara en una habitación, a pesar de que se le admitió bajo el servicio de medicina interna. Recibió el tra-tamiento sentado en una silla de la sala de emergencias. Mientras, tenía las piernas hinchadas. Además, se quejaba de dolor en el costado y náuseas. Presentaba abdomen glo-boso, peristalsis disminuida, dolor abdominal, dolor en el flanco derecho con defensa, vómitos, fiebre y escalofríos.
El 26 de octubre de 2004 Jesús Manuel pidió a su padre, Alejandro Confesor Rodríguez Ramos, que lo sacara del Hospital Universitario y lo llevara a su casa porque sentía que en el hospital lo dejarían morir. Rodríguez Ramos así lo hizo. Contrario a las indicaciones médicas, se lo llevó para su residencia en Camuy.
Ante el continuo deterioro en la condición de Jesús Manuel, los familiares llamaron al médico de cabecera para que le atendiera en su casa. El galeno recomendó llevarlo nuevamente al hospital. El 30 de octubre llegó al Hospital Dr. Angel Otero López, en Manatí. Allí le realizaron una *895 placa de abdomen que reflejó que el intestino estaba distendido. Había presencia de aire y líquido en el cua-drante superior derecho de la cavidad abdominal, compatible con la existencia de una perforación.
Se le admitió al día siguiente bajo el cuido del Dr. Emilio Ramos Escoda, con un diagnóstico de asma bronquial, obe-sidad mórbida, diabetes mellitus por historial, y trata-miento con antibióticos intravenosos. El 1 de noviembre de 2004 se le realizó un CT abdominal que reflejó una infla-mación en el colon ascendente y abscesos (colecciones de pus) en tres lugares diferentes. El radiólogo consultado concluyó que esos hallazgos eran compatibles con una per-foración del apéndice, divertículos o la enfermedad de Chron’s.
En sus determinaciones de hechos, el Tribunal de Pri-mera Instancia concluyó que no fue hasta el 8 de noviem-bre que el doctor Ramos Escoda consultó con el radiólogo, Dr. Luis Rodríguez, y decidieron drenar el absceso que ubi-caba alrededor del hígado (absceso perihepático) mediante un drenaje percutáneo. El drenaje se instaló el 9 de no-viembre de 2004, a pesar de que se conocía de ese absceso desde el 1 de noviembre. Ese hallazgo se confirmó el 6 de noviembre con otro CT Sean que evidenció un aumento en la acumulación de pus en el área. El Tribunal de Primera Instancia creyó la prueba pericial de los demandantes, y concluyó que la acumulación de pus tenía como origen la infección, pues esta provocó una perforación intestinal que no se operó a tiempo.
El drenaje percutáneo mejoró la condición del paciente por unos días. Para el 11 de noviembre de 2004 había dre-nado 500 ce de pus. Dos días después le dieron de alta, con el drenaje instalado. Se programó una visita de segui-miento para el 22 de noviembre de 2004.
Aproximadamente dos días después de que se le diera de alta, el catéter del drenaje percutáneo se desprendió mientras bañaban al paciente en su casa. Su madre, la *896 Sra. Hilda Rodríguez Olavarría, llamó a la oficina del doctor Ramos Escoda para informar lo sucedido. Se le indicó que lo dejaran así hasta la visita de seguimiento, que ten-dría lugar una semana después.
El 22 de noviembre de 2004, día de la visita de segui-miento con el doctor Ramos Escoda, Jesús Manuel no con-taba con el dinero para pagar la consulta. La secretaria del galeno les indicó que si no tenían dinero no se atendería al paciente. Desde el desprendimiento del catéter la condición de Jesús Manuel retomó su deterioro.
Al día siguiente regresó a la sala de emergencias del Hospital Dr. Alejandro Otero López, con dificultad respira-toria, abdomen distendido, dolor abdominal, taquicardia y sepsis. Se le internó en la Unidad de Cuidado Intensivo, conectado a un ventilador, con un diagnóstico de empiema en el pulmón derecho. Esto es una infección que produce una colección de pus entre el pulmón y la membrana que lo reviste. Según la prueba que creyó el Tribunal de Primera Instancia, el empiema fue consecuencia de la infección in-trabdominal que se extendió a otras partes del cuerpo.
Jesús Manuel sufrió un fallo respiratorio el 24 de no-viembre de 2004. Para tratar esa nueva complicación, se le realizó una decorticación, que es una cirugía mayor para extirpar la corteza del pulmón, lo que requirió que se le removiera una costilla. Esta operación se realizó el 16 de diciembre. Se le dio de alta el 31 de diciembre de 2004.
Una vez en su casa, la condición de salud de Jesús Manuel continuó en retroceso. El Tribunal de Primera Instan-cia concluyó que se encontraba séptico, con el intestino per-forado y dolor en el abdomen. Desarrolló úlceras por estar encamado, un proceso inflamatorio, abscesos y fascitis ne-crotizante en los muslos.
El 25 de enero de 2005 regresó al Hospital Dr. Angel Otero López. Allí quedó bajo el cuidado del Dr. Félix Figueroa Pérez, quien limitó el tratamiento a los abscesos en los *897 muslos, a pesar de que tenía conocimiento de la existencia de historial médico previo de Jesús Manuel en esa institución. También le realizó dos operaciones de debrida-ción de las heridas en los muslos. Sin embargo, no solicitó acceso a los récords de las admisiones previas y que apun-taban a una infección intrabdominal y estado séptico. El Tribunal de Primera Instancia creyó la versión de los de-mandantes de que el trato del doctor Figueroa Pérez fue tan irrespetuoso, humillante y malcriado que llegó a utili-zar palabras soeces hacia el paciente.
Al ver que el tratamiento que recibía Jesús Manuel no rendía frutos, su hermano, Alejandro Confesor Rodríguez Rodríguez, hizo gestiones para trasladarlo al Bridgeport Hospital en Connecticut. Se le admitió el 11 de febrero de 2005 con un diagnóstico de sepsis abdominal. A pesar de que se le sometió a tratamiento, la infección estaba descon-trolada, el paciente estaba inmunosuprimido y en un es-tado de deterioro físico que impidió su recuperación. Falle-ció el 16 de marzo de 2005, a los 29 años de edad.
Luego de evaluar los expedientes y testimonios de los peritos de ambas partes, el Tribunal de Primera Instancia concluyó que Jesús Manuel sufrió la perforación de un divertículo en el colon sigmoide, parte del intestino grueso. Aunque éste ubica en el lado izquierdo del abdomen, y el dolor del que se quejaba Jesús Manuel mientras estuvo en el Hospital Dr. Angel Otero López era en el lado derecho, el tribunal dio credibilidad a los testimonios de los peritos de la parte demandante, y se convenció de que esa porción del intestino puede moverse libremente por la cavidad abdominal.
Además, el foro de primera instancia estimó que la per-foración debió sellarse durante los meses de convalecencia de Jesús Manuel. Por ello, no se reflejó en la autopsia. Esta determinó que Jesús Manuel murió de fascitis necroti-zante, bronconeumonía bilateral, sepsis y una úlcera de cúbito infectada.
*898 El 14 de marzo de 2006 el padre de Jesús Manuel, señor Rodríguez Ramos, la madre, señora Rodríguez Olavarría, por sí y en calidad de herederos de su hijo, y los hermanos Alejandro Confesor, Marisol y María del Carmen Rodrí-guez Rodríguez, demandaron para recobrar daños y perjui-cios ocasionados mediante culpa, negligencia e impericia médica. Incluyeron como demandados al Hospital Dr. Su-soni; la Administración de Servicios Médicos de Puerto Rico (A.S.E.M.) como administradores de la sala de emer-gencias del Centro Médico; a los doctores Ramos Escoda, Figueroa Pérez, y sus respectivas sociedades legales de bie-nes gananciales; el Sindicato de Aseguradores para la Sus-cripción Conjunta de Seguro de Responsabilidad Médico Hospitalaria; el Hospital Dr. Alejandro Otero López, y sus respectivas aseguradoras.
Luego de la conferencia con antelación al juicio, los de-mandantes transigieron las reclamaciones contra el Hospital Dr. Susoni y la A.S.E.M., como administradora de la Sala de Emergencias del Centro Médico, mediante Acuerdo Privado y Confidencial sobre Transacción. Notificaron al Tribunal de Primera Instancia mediante Moción de Desis-timiento Voluntario Parcial con Perjuicio por Transacción en la que acreditaron que los acuerdos relevaron a los de-mandados liberados de la relación interna y externa entre deudores solidarios. El Tribunal de Primera Instancia or-denó mediante sentencia parcial que se sobreseyera y ar-chivara el caso contra el Hospital Dr. Susoni el 24 de no-viembre de 2008, y contra la A.S.E.M., el 2 de diciembre de 2008. Ambas sentencias advinieron finales y firmes hace más de tres años.
Tras la celebración del juicio, el Tribunal de Primera Instancia estimó los daños de Jesús Manuel en $500,000; a la Sra. Rodríguez Olavarría, el Sr. Rodríguez Ramos y al Sr. Rodríguez Rodríguez en $225,000 cada uno; a Marisol Rodríguez Rodríguez se le concedieron $50,000. La otra *899 hermana, María del Carmen Rodríguez Rodríguez, había abandonado la causa de acción, por lo que no se le dio com-pensación alguna.
En su sentencia, el tribunal no dispuso a cuánto ascen-día la responsabilidad por los daños que ocasionaron los demandados relevados, si alguno. Se limitó a responsabili-zar al doctor Ramos Escoda en un 80% de los daños y al doctor Figueroa Pérez en un 20% de los daños. Al Hospital Dr. Alejandro Otero López se le condenó a responder soli-dariamente, por su responsabilidad vicaria. Los deman-dantes transigieron con esta institución hospitalaria luego de que iniciara el proceso apelativo.
Inconforme con la determinación del Tribunal de Pri-mera Instancia, el doctor Ramos Escoda acudió ante el Tribunal de Apelaciones. Señaló que el foro de primera ins-tancia erró al imputarle el 80% de la responsabilidad por lo ocurrido y estimar los daños globales en $1,225,000. Ade-más, alegó que el paciente y sus familiares fueron negli-gentes durante el tratamiento y rechazó que Jesús Manuel sufriera una perforación en su intestino. Por último, re-clamó que se equivocó el Tribunal de Primera Instancia al no solicitar los acuerdos transaccionales para determinar los efectos que éstos pudieran tener en la relación interna y externa de los deudores solidarios.
El Tribunal de Apelaciones confirmó las determinacio-nes de hechos del Tribunal de Primera Instancia. Sin embargo, consideró que las cuantías concedidas como compen-sación fueron exageradamente altas. Redujo los daños de Jesús Manuel a $196,024.39; los de cada uno de sus padres a $125,956.09; los de su hermano a $75,000 y los de la hermana a $16,349.26. Para llegar a esa reducción utilizó precedentes nuestros en daños y perjuicios por impericia médica que estimó similares, en los que concedimos com-pensaciones a familiares, y realizó un cálculo para identi-ficar el valor presente de las cuantías.
*900 Inconformes con esa determinación, ambas partes recu-rrieron ante nos. Los demandantes piden que se reviertan las cuantías que concedió el Tribunal de Primera Instancia. El doctor Ramos Escoda repitió los señalamien-tos de error que presentó ante el Tribunal de Apelaciones.
Expedimos el auto de certiorari en ambos recursos y or-denamos su consolidación. Con la comparecencia de ambas partes, estamos en posición de resolver.
II
El Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141, obliga a quien ocasione un daño por culpa o negligencia, a resarcir a la víctima. La imprudencia concurrente de esta última no la exime de responsabilidad, pero puede significar una reducción en la indemnización.
Una acción para exigir responsabilidad profesional a un médico no es distinta a la de un caso ordinario de daños y perjuicios por negligencia al amparo del Art. 1802 del Código Civil, supra. Ortega et al. v. Pou et al., 135 D.P.R. 711, 714 (1994). Por lo tanto, requiere que la parte demandante establezca por preponderancia de la evidencia, creída por el juzgador, que los actos de negligencia, falta de cuidado o impericia del médico causaron el daño emergente. Sáez v. Municipio de Ponce, 84 D.P.R. 535, 543 (1962).
Es norma reiterada en nuestra jurisdicción que cuando dos o más personas causan daño, al amparo del Art. 1802 del Código Civil, supra, todos serán solidariamente responsables frente a la persona perjudicada. US Fire Insurance v. A.E.E., 174 D.P.R. 846, 855 (2008); Rivera Hernández v. Comtec Comm., 171 D.P.R. 695, 710 (2007); Rivera v. Great American Indemnity Co., 70 D.P.R. 825, 828 (1950); Cruz et al. v. Frau, 31 D.P.R. 92, 100 (1922).
Al ser solidaria la responsabilidad en caso de que haya *901 más de un cocausante del daño, cada acreedor o deudor puede exigir la totalidad de la prestación, sin peijuicio de que posteriormente se recurra a la acción de nivelación entre los codeudores como método para ajustar cuentas. Art. 1098 del Código Civil, 31 L.P.R.A. 3109; S.L.G. Szendrey v. Hospicare, Inc., 158 D.P.R. 648, 654 (2003); L.R. Rivera Rivera, El contrato de transacción: sus efectos en situaciones de solidaridad, San Juan, Jurídica Editores, 1998, pág. 166. Esto es, en la relación externa, frente al acreedor, cada cocausante es responsable por la totalidad de la deuda.
Pero al mismo tiempo existe entre cocausantes una re-lación interna, en que cada uno está supuesto a responder de acuerdo al grado de responsabilidad en el daño infligido. La excepción son los casos de insolvencia, en que toca dis-tribuirse a prorrata la responsabilidad del insolvente entre los demás cocausantes. Art. 1098 del Código Civil, supra; S.L.G. Szendrey v. Hospicare, Inc., supra. La acción de ni-velación pretende evitar el enriquecimiento injusto que surgiría si algún cocausante tiene que responder por el daño causado por otro, que tiene capacidad de pago. S.L.G. Szendrey v. Hospicare, Inc., id.
III
A. Luego de examinar el expediente de este caso, con-firmamos la conclusión del Tribunal de Apelaciones de que el Tribunal de Primera Instancia no incurrió en pasión, prejuicio, parcialidad ni error manifiesto que amerite que alteremos sus determinaciones de hechos. La sentencia que emitió el foro primario denota una minuciosa pondera-ción de la prueba que presentaron todas las partes y domi-nio de la información sobre la condición de salud de Jesús Manuel Rodríguez Rodríguez, y su consecuente deterioro.
De esta forma, es correcta la decisión del foro interme-dio de confirmar al Tribunal de Primera Instancia en su *902 conclusión de que el doctor Ramos Escoda incurrió en mala práctica de la medicina al atender a Jesús Manuel. Su ma-nejo inadecuado del paciente mientras estuvo en sus ma-nos fue la causa, en parte, de que la condición de salud del paciente se agravara sustancialmente.
El demandado solicita que reduzcamos el porciento de responsabilidad que se le imputó, para atribuir responsa-bilidad a la víctima y su familia por haber incurrido en negligencia concurrente. Tampoco vemos razón para inter-venir con la determinación de hechos que hizo el Tribunal de Primera Instancia en ese extremo.
B. Por otro lado, el doctor Ramos Escoda señala que los foros de instancia erraron al no solicitar copia de los acuerdos de transacción confidenciales a los que llegaron los demandantes con el Hospital Dr. Susoni y el Centro Médico. El demandado reclama que las cuantías que reci-bieron los demandantes por esos acuerdos deben reducirse del monto de daños concedidos.
Los demandantes rechazan que se divulguen los acuerdos. Acreditaron al tribunal que ambos son del tipo que avalamos en S.L.G. Szendrey v. Hospicare, Inc., supra. De esta forma, aseguran que lo recibido no se tiene que descontar del monto de responsabilidad que se imputó al doctor Ramos Escoda porque medió un relevo de responsa-bilidad en la relación interna y externa.
En Puerto Rico existe una fuerte política pública para promover que se transijan las controversias y evitar que lleguen a los tribunales porque se ahorra tiempo y dinero a las partes involucradas, descongestionan los calendarios judiciales y propenden al diálogo y paz entre los ciudadanos. Carpets & Rugs v. Tropical Reps, 175 D.P.R. 615, 629 (2009).
En los casos de daños y peijuicios, los demandantes pueden renunciar a la reclamación contra alguno de los cocausantes solidarios, o con todos, mediante contrato de transacción. Sagardía de Jesús v. Hosp. Aux. Mutuo, 177 *903 D.P.R. 484, 498 (2009); US Fire Insurance v. A.E.E., supra, pág. 855. Un contrato de transacción es un acuerdo me-diante el cual las partes dan, prometen o retienen alguna cosa, con el propósito de evitar un pleito o poner término a uno que ya comenzó. Art. 1709 del Código Civil, 31 L.P.R.A. sec. 4821; US Fire Insurance v. A.E.E., supra, pág. 853; Blás v. Hospital Guadalupe, 167 D.P.R. 439, 449 (2006). Los elementos característicos de un contrato de transac-ción son: (1) la existencia de una controversia o relación jurídica incierta litigiosa; (2) la intención de las partes de eliminar o superar esa controversia; y (3) concesiones recíprocas. Sagardía de Jesús v. Hosp. Aux. Mutuo, supra, pág. 498; US Fire Insurance v. A.E.E., supra, pág. 853; Blás v. Hospital Guadalupe, supra, pág. 449; Rivera Rivera, op. cit., pág. 35.
Los efectos que tendrá un contrato para transigir la re-clamación contra uno de varios cocausantes solidarios so-bre los demás demandados dependerán de lo pactado. Sagardía de Jesús v. Hosp. Aux. Mutuo, supra, pág. 499; US Fire Insurance v. A.E.E., supra, pág. 855; S.L.G. Szendrey v. Hospicare, Inc., supra, pág. 655.
Por ejemplo, puede que el contrato de transacción releve al codemandado con quien se transige frente al deman-dante, en la relación externa, y frente a los demás cocau-santes al mismo tiempo. Los demandados que queden en el pleito no podrán traerle al pleito posteriormente porque el demandante asume la parte de la responsabilidad que co-rresponde al codemandado relevado, como ocurrió en el caso de S.L.G. Szendrey v. Hospicare, Inc., supra. Véase, además, US Fire Insurance v. A.E.E., supra, págs. 855-856.
También puede suceder que el demandante releve a un codemandado de la relación externa, mas no de la interna. En estos casos, los demás cocausantes podrán ir contra él en una acción de nivelación si fuera necesario. De no ser así, se suscitaría un enriquecimiento injusto. US Fire Insurance v. A.E.E., supra, págs. 856-858 y 860.
*904 La transacción contenida en el contrato solo comprende “los objetos expresados determinadamente en ella, o que, por una inducción necesaria de sus palabras, deban reputarse comprendidos en la misma”. Art. 1714 del Código Civil, 31 L.P.R.A. sec. 4826. Los contratos de transacción deben interpretarse de forma restrictiva. US Fire Insurance v. A.E.E., supra, pág. 854; Bids v. Hospital Guadalupe, supra, págs. 450-451. Por consiguiente, para auscultar cuáles son los efectos de un contrato de transacción, es necesario establecer primero qué fue lo que se pactó. Art. 1714 del Código Civil, supra; US Fire Insurance v. A.E.E., supra, pág. 855.
El contrato de transacción puede ser judicial o extrajudicial. Esta diferencia surge del Art. 1715 del Código Civil, 31 L.P.R.A. sec. 4827, que establece que un acuerdo de transacción tiene la autoridad de cosa juzgada para las partes, pero sólo procederá la vía de apremio cuando se trate de la transacción judicial.
Jurisprudencialmente, hemos definido que la transacción judicial se da cuando, una vez comenzado el pleito, las partes llegan a un acuerdo transaccional y lo hacen incorporar al proceso en curso. Igaravidez v. Ricci, 147 D.P.R. 1, 6 (1998); Ñeca Mortg. Corp. v. A & W Dev. S.E., 137 D.P.R. 860, 870-871 (1995). En cambio, una transacción extrajudicial resulta ser aquella que se celebra antes de que comience el pleito que se quiere evitar, o cuando una vez comenzado, las partes acuerdan una transacción sin la intervención del tribunal. íd. En estos casos, bastará el mero aviso de desistimiento del pleito. Id. Incluso, las partes pueden desistir del pleito sin siquiera mencionar el acuerdo logrado. J.R. Vélez Torres, Curso de Derecho Civil, San Juan, Ed. Rev. Jur. U.I.A.P.R., 1990, T. IV, Vol. II, pág. 498.
Al igual que en Puerto Rico, en España la jurispruden-cia ha señalado que para que pueda considerarse una tran-sacción como judicial, el acuerdo no solo tiene que darse *905 una vez ha comenzado el pleito. También “se hace necesa-rio que se someta al conocimiento y aprobación del juzga-dor lo estipulado e incluso se afirma la necesidad de incor-porarla al pleito iniciado”. (Citas omitidas). S. Tamayo Haya, El contrato de transacción, Madrid, Thompson y Civitas, 2003, pág. 516. Se señala que la consecuencia de no incorporar el acuerdo a los autos del caso será que carezca de “sustancia procesal y no servirá de título para la ejecu-ción en caso de incumplimiento”. Id., págs. 516-517. Ello se refiere a la vía de apremio a la que hace referencia el Código Civil.
De lo dicho se concluye, por una parte, que transacción judicial no se hace equivaler con transacción que pone término a un procedimiento judicial en curso. Consiguientemente, será con-siderada transacción extrajudicial tanto aquella alcanzada fuera de los tribunales efectuada para evitar la provocación de un pleito, como aquella otra en la que por poner fin a uno ya comenzado, aunque sí tuvieron conocimiento de ella, por el contrario no se incorporó al proceso. íd., pág. 517.
En este caso, los demandantes llegaron a acuerdos tran-saccionales con dos de los demandados mediante un con-trato confidencial cuyo contenido y detalles no revelaron al tribunal. Se limitaron a informar que se desistía del pleito contra ambos demandados porque llegaron a un acuerdo del tipo avalado en S.L.G. Szendrey v. Hospicare, Inc., supra.
Esto nos lleva a concluir que los acuerdos a los que lle-garon las partes fueron extrajudiciales. Ninguno consta en los autos del caso ni tampoco se conocen los detalles de las prestaciones entre las partes. Lo único que se acreditó al tribunal en las mociones de desistimiento fue que se relevó de la relación interna y externa a los codemandados liberados.
Sin embargo, ello no dispone de la petición que hace ante nos el doctor Ramos Escoda, para que solicitemos co-pia del acuerdo confidencial. Al hacer su solicitud, el doctor Ramos Escoda obvia el hecho de que el Tribunal de Pri- *906 mera Instancia emitió dos sentencias parciales finales para desestimar la causa de acción en contra del Hospital Dr. Susoni y de la A.S.E.M conforme a la Regla 42.3 de Procedimiento Civil, 32 L.P.R.A. Ap. V. En ambas sentencias, del 24 de noviembre de 2008 y del 2 de diciembre del 2008, respectivamente, se hizo constar que los demandan-tes acreditaron que los codemandados con los que firmaron los acuerdos quedaron liberados de responder solidaria-mente tanto en la relación interna como en la externa. Por consiguiente, el Tribunal de Primera Instancia ordenó la liberación de ambos codemandados en su relación interna y externa con los demás codeudores solidarios y el demandante.
La Regla 42.3 de Procedimiento Civil, supra, per-mite a los tribunales dictar sentencias parciales finales cuando no existe razón para continuar con el pleito contra alguna de las partes. Esto ocurre antes de que concluya el pleito contra otra de las partes o reclamaciones que pervivan.
La Regla 47 de Procedimiento Civil, 32 L.P.R.A. Ap. V, señala que el término para pedir reconsideración de una sentencia u orden es de 15 días, mientras que el término para apelar es de 30 días, ambos contados a partir de la fecha del archivo en autos de copia de la notificación, de acuerdo con la Regla 52.2 de Procedimiento Civil, 32 L.P.R.A. Ap. V.
En este caso ambas sentencias advinieron finales y fir-mes 30 días después de la fecha de archivo en autos de copia de la notificación de la sentencia sin que se solicitara reconsideración ni se apelara alguna de ellas, conforme a las Reglas 47 y 52.2 de Procedimiento Civil, supra.
Así pues, el demandado que permanece en el pleito no puede, mediante un señalamiento de error, pretender que alteremos subsidiariamente una sentencia que advino final y firme y sobre la que ya no tenemos jurisdicción. Ac- *907 ceder a su petición de solicitar los acuerdos firmados, para revisar los efectos que pudieran tener sobre la relación in-terna y externa entre los demás deudores solidarios, ten-dría el efecto simultáneo de revisar una sentencia parcial que advino final y firme hace más de tres años.
El Tribunal de Primera Instancia ya adjudicó, por sen-tencia final y firme, que las partidas que recibieron los demandados mediante los acuerdos transaccionales no ten-drán consecuencias sobre la adjudicación de responsabili-dad ni la partida que recaiga sobre el doctor Ramos Escoda. Por eso, no procede la solicitud de revisar el acuerdo para determinar sus consecuencias. Si el code-mandado quería que el Tribunal de Primera Instancia re-visara los acuerdos confidenciales, debió solicitarlo antes de que recayera la sentencia parcial desestimatoria. Tam-bién pudo solicitar revisión o apelar a tiempo la sentencia parcial final que recogió exactamente lo que los demandan-tes alegaron que contenían las transacciones. Al no ha-cerlo, se allanó a que se relevara al Hospital Dr. Susoni y la A.S.E.M. de la relación interna y externa, lo que hace im-pertinente que este foro ordene la revisión de los acuerdos.
C. El doctor Ramos Escoda también señala que fue un error del foro primario determinar que el doctor Figueroa Pérez y él fueron los únicos que ocasionaron el 100% de los daños a Jesús Manuel y su familia. Resaltan que, la prueba desfilada denota que otros galenos e instituciones hospitalarias incurrieron en actuaciones que redundaron en daños. De esta forma, reclaman que es injusto que se les haga pagar el 100% de los daños determinados.
De la prueba que obra en el expediente, surge que los otros codemandados pudieron incurrir en actos u omisio-nes que causaron daños al paciente. Sin embargo, esto no se refleja en la sentencia del Tribunal de Primera Instan-cia, que concentró el 100% de la responsabilidad en los dos codemandados que no llegaron a acuerdos transaccionales, *908 adjudicándole un 80% al doctor Ramos Escoda y un 20% al doctor Figueroa Pérez. En ese aspecto, consideramos que el Tribunal de Primera Instancia erró.
El que varios codemandados transigieran el pleito, en un acuerdo que los relevó de su responsabilidad interna y externa, no implica que se obvie el hecho de que pudieron ocasionar parte de los daños. La porción de responsabili-dad de todos los originalmente demandados debe deta-llarse en la sentencia. Si se concluyera que alguno de los codemandados no incurrió en responsabilidad, debe ha-cerse constar también en la sentencia.
En US Fire Insurance v. A.E.E., supra, págs. 860-861, señalamos que la determinación judicial de responsabilidad debe indicar la porción exacta que corresponde a cada cocausante o, de lo contrario, se impondrá responsabilidad en cuotas iguales. Sin embargo, en esa ocasión también advertimos que eso no impide que las partes recurran a los mecanismos procesales disponibles para que se especifique el porciento de responsabilidad de cada uno. Id., pág. 861 esc. 4. La prueba que obra en el expediente de este caso, y la misma sentencia del Tribunal de Primera Instancia, nos impide concluir que todos los codemandados incurrieron en igual proporción de responsabilidad.
El Tribunal de Primera Instancia debe aclarar qué por-ción de responsabilidad corresponde a cada uno de los de-mandados, incluyendo a los que transigieron el pleito. En la sentencia debe hacerse constar la porción de responsa-bilidad de cada codemandado, y restarse los porcientos co-rrespondientes a los codemandados liberados mediante transacción total de las cuantías estimadas de daños.
IV
Hemos reiterado que los tribunales apelativos no debemos intervenir con las determinaciones de los juzga- *909 dores de primera instancia, salvo que medie pasión, prejui-cio, parcialidad o error manifiesto en la apreciación de la prueba. Serrano Muñoz v. Auxilio Mutuo, 171 D.P.R. 717, 741 (2007); Álvarez v. Rivera, 165 D.P.R. 1, 25 (2005); Rodríguez v. Concreto Mixto, Inc., 98 D.P.R. 579, 593 (1970).
En los casos de daños y perjuicios, específicamente, he-mos reconocido que “la tarea judicial de estimar y valorar los daños resulta difícil y angustiosa [porque] no existe un sistema de computación que permita llegar a un resultado exacto con el cual todas las partes queden completamente complacidas”. Herrera, Rivera v. S.L.G. Ramírez-Vicéns, 179 D.P.R. 774, 784 (2010). Véanse: Sagardía de Jesús v. Hosp. Aux. Mutuo, supra, pág. 509; Velázquez Ortiz v. U.RR., 128 D.P.R. 234, 236 (1991) (Sentencia).
Es por ello que los foros apelativos guardarán deferencia a las valorizaciones de daños que hagan los foros de primera instancia, porque son éstos los que tienen contacto directo con la prueba testifical y quedan en mejor posición para emitir un juicio. Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, pág. 784; Sagardía de Jesús v. Hosp. Aux. Mutuo, supra, pág. 509; Velázquez Ortiz v. U.P.R., supra, pág. 236.
De esta forma, nos hemos apegado a la norma de que no intervendremos con las estimaciones de daños que haga el Tribunal de Primera Instancia, salvo cuando la cuantía que se conceda sea exageradamente alta o ridiculamente baja. Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, págs. 784-785. Sagardía de Jesús v. Hosp. Aux. Mutuo, supra, págs. 509-510; Velázquez Ortiz v. U.P.R., supra, págs. 236.
Al revisar una sentencia del Tribunal de Primera Instancia que concedió daños, los foros apelativos deben considerar la prueba desfilada y concesiones otorgadas en casos similares resueltos anteriormente. A pesar de que reconocemos que cada caso es distinto y tiene circunstancias particulares, los precedentes son referencia útil para *910 la determinación de si la compensación es exageradamente alta o ridiculamente baja. Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, pág. 785.
Los demandantes recurren ante nos para que restituya-mos la compensación por daños que concedió el Tribunal de Primera Instancia y que redujo el Tribunal de Apelaciones.
El foro primario concedió a los demandantes una par-tida global ascendente a $1,225,000. De esa cifra, $500,000 correspondían a los daños que sufrió Jesús Manuel antes de morir. Además, se concedieron $225,000 a cada uno de sus progenitores y una cifra igual a su hermano, quien el Tribunal de Primera Instancia destacó que demostró un alto compromiso y dedicación para cuidar a Jesús Manuel durante los meses de convalecencia. A la otra hermana que permaneció en el pleito le asignaron $50,000.
Sin embargo, el Tribunal de Apelaciones determinó que la cantidad que concedió el Tribunal de Primera Instancia era exageradamente alta. Determinó reducirla a una cifra global de $539,285.83. Esa cifra se distribuye en $196,956.39 por los daños que sufrió Jesús Manuel y $125,956.09 para cada uno de sus progenitores. La partida que se concedió a su hermano, Alejandro Rodríguez Rodrí-guez, se redujo a $75,000. A Marisol Rodríguez Rodríguez, la hermana, le correspondieron $16,349.26.
Para llegar a esas cuantías, el foro apelativo intermedio se dejó llevar por el procedimiento que adoptamos en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra. A su vez, en ese caso, adoptamos el método que recomendó el exjuez Antonio J. Amadeo Murga. Véase A. J. Amadeo Murga, El valor de los daños en la responsabilidad civil, Ira ed., San Juan, Editorial Esmaco, 1997, T. 1, págs. 91-116. Así, ins-truimos a tomar en consideración compensaciones otorga-das en precedentes judiciales, actualizándolas al valor presente.
En ese ejercicio de actualizar partidas al valor presente, utilizamos el cambio que ha tenido el poder adquisitivo del *911 dólar a través del tiempo, que se basa en el índice de pre-cios al consumidor, para obtener el ajuste por inflación, acorde con la recomendación del tratadista en ese momento. Amadeo Murga, op. cit., Ira ed., págs. 91 y 100-102. Luego, se hizo un ajuste adicional por el crecimiento en la economía ocurrido entre la sentencia que se utiliza como comparación y la fecha en que se dicta la sentencia en el caso que se evalúa en la actualidad. Id., págs. 102-105.
El valor adquisitivo del dólar se deriva del índice de precios al consumidor. El Departamento del Trabajo y Re-cursos Humanos adoptó en el 2009 un nuevo índice de pre-cios al consumidor, que utiliza como año base el 2006, y dejó atrás la versión anterior que utilizaba el 1984 como año base.(1) Ese nuevo índice de precios se desarrolló en colaboración con el Negociado de Estadísticas del Departa-mento del Trabajo Federal. El libro de Amadeo Murga que utilizamos como referencia en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, se valía del índice de precios que usaba el 1984 como año base.
El índice de precios al consumidor es la herramienta que utiliza el Departamento del Trabajo y Recursos Huma-nos para medir los cambios en el costo de vida en Puerto Rico.(2) Surge de una serie de modelos estadísticos, entre los que se encuentra la canasta de artículos y servicios. Esta canasta resulta ser una descripción de los gastos usuales en los que incurre una familia típica en Puerto Rico en determinado momento, a los precios que los venden en los lugares en que usualmente los adquieren.(3) Tam- *912 bién considera los ingresos.(4) Véase, además, A.J. Amadeo Murga, El valor de los daños en la responsabilidad civil, 2da ed., España, Bosch Editor, 2012, págs. 70-71. Es decir, con el cambio en el año base se reconsideran los artículos que se incluyen en esa canasta de artículos y servicios, acorde con los cambios en el consumo de la población. J.J. Álvarez González y L.M. Pellot Juliá, Responsabilidad civil extracontractual, 81 Rev. Jur. U.P.R. 661 (2012). M.Z. Olmo Quiñones y J.A. Villeta Trigo, Revisión del Indice de Precios al consumidor, 19 (Núm. 54) Rev. Trab. 46 (abril 2008).
Recientemente, Amadeo Murga publicó una nueva edi-ción de su libro. En ella desfavorece el nuevo índice de precios al consumidor. Su reserva consiste en que, según su análisis, con el nuevo índice el costo de vida en Puerto Rico resulta más bajo que en Estados Unidos lo que entiende contrasta con la realidad. Amadeo Murga, op. cit, 2da ed., págs. 71-72. El tratadista en su nueva edición prefiere uti-lizar el producto bruto per cápita como herramienta para traer al valor presente partidas concedidas en el pasado. Amadeo Murga señala que la Junta dé Planificación pu-blica consecuentemente ese índice, y toma en considera-ción el aumento por inflación y el aumento por el nivel de vida. Amadeo Murga, op. cit, 2da ed., pág. 72.(5)
Sin embargo, al mismo tiempo Amadeo Murga reconoce que el índice de precios al consumidor es el mecanismo que más frecuentemente se utiliza para computar el valor rela- *913 tivo de la moneda. Amadeo Murga, op. cit., 2da ed., pág. 70. Por ello, no lo descarta como alternativa, aunque reco-mienda que si se opta por continuar con su uso, se haga un ajuste adicional por el crecimiento económico. En la pri-mera edición de su libro, esa segunda parte del proceso se reservó para cuando se traían partidas concedidas muchos años antes. Véanse: Amadeo Murga, op. cit., 2da ed., pág. 72; Amadeo Murga, op. cit., Ira ed., págs. 102-105.
En contraste, otros tratadistas continúan utilizando el índice de precios al consumidor para actualizar al valor presente compensaciones concedidas en el pasado y desfa-vorecen la segunda parte del proceso para hacer un ajuste adicional por el crecimiento económico. Incluso, sostienen esta posición al considerar el nuevo índice de precios al consumidor, con el 2006 como año base. Véase Alvarez González y Pellot Juliá, supra.
El profesor Alvarez González no ve justificación para que se añada una segunda parte al proceso de actualizar al valor presente cifras concedidas en el pasado cuando se utiliza el índice de precios al consumidor, como propone Amadeo Murga. Sus reservas a la segunda parte del pro-ceso se basan en que el índice de precios al consumidor ya considera el crecimiento económico, y hacer un cálculo adi-cional significaría compensar más a las víctimas presentes, y sus familiares, que a las del pasado. Alvarez González y Pellot Juliá, supra.
Según Amadeo Murga, la segunda parte del proceso, que en la primera edición de su libro se reservaba para aquellos casos que datan de mucho tiempo atrás, tiene el propósito de hacer un ajuste adicional “para adecuar la compensación a una economía que goza de un nivel o es-tándar de vida mayor”. Entendemos que esa adecuación se hace innecesaria cuando, conjunto con el año base, se ac-tualiza la canasta de bienes y servicios de la que se obtiene el índice de precios al consumidor, que evalúa los cambios en los ingresos, así como en los artículos y servicios que se *914 consumen. Es recomendable que se haga una revisión del índice de precios cada diez años. Olmo Quiñones y Villeta Trigo, supra, pág. 47. Como enfatizan el profesor Alvarez González y Pellot Juliá:
Tenemos dudas sobre la justificación de hacer ese segundo cómputo. Recuérdese que de lo que se trata es de conceder una partida por daños morales —que carecen de valor económico intrínseco que refleje una suma que compense esos daños, con vista a las ejecutorias judiciales pasadas. No comprendemos por qué debe hacerse un cómputo distinto y adicional al que pretende conceder hoy un valor comparable al que se concedió ayer por sufrimientos de intensidad y consecuencia psíquica similares. El único fundamento que podría justificar un cóm-puto adicional basado en la mayor calidad de vida actual en comparación con el pasado, es que la intensidad del sufri-miento moral aumenta según la sociedad progresa. Esa pre-misa no parece justificable; no creemos que pueda decirse que la intensidad del sufrimiento moral de una persona tenga re-lación alguna con ese progreso. Pensamos que el sufrimiento de un padre o madre por la pérdida de un hijo, por ejemplo, presumiendo que exista una relación afectiva similarmente estrecha, no varía de época en época. Alvarez González y Pe-llot Juliá, supra, pág. 677.
Esto nos lleva a concluir que cuando utilizamos un ín-dice de precios al consumidor cuyo año base es reciente, como en este caso, se hace innecesario el ajuste correspon-diente al crecimiento económico que señala el profesor Amadeo Murga como segunda parte del proceso de actua-lización de las partidas concedidas cuando se utiliza el ín-dice de precios al consumidor.
Es obvio que no hay consenso entre los expertos del tema sobre qué método utilizar para actualizar partidas concedidas en el pasado. Depende de la fiabilidad que a cada uno le merezcan las diferentes estadísticas que pro-veen las fuentes oficiales. En esta opinión optamos por apegarnos a la que utiliza el índice de precios, que fue la estadística oficial que ya adoptamos en el pasado, con las modificaciones señaladas, que también han avalado exper-tos y economistas.
*915 Si del proceso de actualización de cifras resultan cuan-tías que consideramos muy bajas, puede responder a que las concedidas en el pasado también eran muy bajas. Véase Alvarez González y Pellot Juliá, supra. Ahora concedemos lo que corresponde de acuerdo a las circunstancias particu-lares del caso. Por eso avalamos las compensaciones del Tribunal de Primera Instancia, que eran sustancialmente superiores a los precedentes judiciales.
Somos conscientes de que la Opinión concurrente y disidente de la Juez Asociada Señora Rodríguez Rodríguez favorece la nueva metodología que propone el exjuez Ama-deo Murga. Respetamos su criterio porque reconocemos que entre los economistas y expertos del tema no hay con-senso y el método por el que opta la Opinión concurrente y disidente es uno de ellos. Sin embargo, peca de hacer lo mismo que critica.
En primer lugar, la crítica parte de la premisa equivo-cada de que con el método que adoptamos en esta Opinión descartamos lo resuelto en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra. En verdad hoy no descartamos a Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, sino que lo modificamos siguiendo las recomendaciones de tratadistas y expertos en la materia. Irónicamente, al seguir la reco-mendación de Amadeo Murga, la Opinion concurrente y disidente modifica también el análisis que seguimos en aquel precedente judicial.
Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, se basó en la primera edición de El valor de los daños en la respon-sabilidad civil, cuya segunda parte del análisis —para ac-tualizar al valor presente cifras concedidas en el pasado— no era mandatoria en todos los casos. Se reservaba para los casos en que se traían al valor presente cifras concedi-das muchos años antes. Amadeo Murga, op. cit., Ira ed., págs. 102-105. El exjuez Amadeo Murga, en su tratado, ni siquiera precisaba cuántos años tenían que pasar entre una compensación y otra para que se utilizara esa segunda parte *916 del proceso. Con el índice de precios al consumidor actua-lizado, como vimos, esa segunda parte del análisis, opcio-nal en sus orígenes, se hace innecesaria.
Nótese que el índice de precios al consumidor sigue siendo la base de nuestro análisis, como en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra. En contraste, la Opinión Concurrente y Disidente sigue la recomendación más re-ciente del tratadista Amadeo Murga, en que se adopta como base del análisis el producto bruto per cápita y des-carta el índice de precios al consumidor. Con él, se descarta también la base del análisis utilizado en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra. Ahora, “sin sujeción a lo es-tablecido por este Tribunal”, utiliza un índice que no se había considerado en nuestros precedentes judiciales. Opi-nión concurrente y disidente emitida por la Juez Asociada Señora Rodríguez Rodríguez, pág. 938.
De esto queda claro que es ineludible modificar el análisis que inauguramos en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra. Los precedentes pueden cambiarse cuando del análisis surge que el precedente judicial era (1) claramente erróneo, (2) sus efectos sobre el resto del ordenamiento son adversos y (3) la cantidad de personas que confían en la decisión es limitada. Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 D.P.R. 365 (2012); Pueblo v. Camacho Delgado, 175 D.P.R. 1 (2008); González v. Merck, 166 D.P.R. 659, 688 (2006) (Hernández Denton, J., Op. de conformidad). En este caso, se deduce de nuestro análisis y del que esboza la Opinión concurrente y disidente emitida por la Juez Asociada Señora Rodríguez Rodríguez que el precedente judicial es erróneo. De las alternativas disponibles, preferimos recurrir a las estadísticas oficiales que reúnen los economistas y no las que corresponden a la preferencia personal de ningún autor.
No podemos olvidar que con este ejercicio no pretende-mos desarrollar una ciencia exacta pues, después de todo, lo que buscamos es un estimado, ya que no existe un sis- *917 tema de computación con el que todas las partes queden satisfechas. Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, pág. 784.
En el caso bajo análisis, el Tribunal de Apelaciones hizo un esfuerzo por seguir el mismo proceso que avalamos en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra. Sin embargo, erró en varios aspectos, por lo que determinamos revocar la reducción de las cuantías que concedió el Tribunal de Primera Instancia. A continuación explicamos cada una de las partidas.

Jesús Manuel Rodríguez Rodríguez

Para reducir la cuantía de $500,000 que concedió el Tribunal de Primera Instancia, el foro apelativo intermedio estableció un paralelismo con la cuantía que concedimos en Colón v. Municipio de Guayama, 114 D.P.R. 193 (1983). Al revisar esa comparación, nos topamos con dos inconvenientes. El primero es que aunque el Tribunal de Apelaciones hizo un esfuerzo por seguir lo que instruimos en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, erró en su aplicación. Segundo, hay ciertas diferencias entre am-bas situaciones de hechos que deben reflejarse en la compensación. Esto nos lleva a concluir que la compensa-ción que otorgó el Tribunal de Primera Instancia no fue exageradamente alta, como concluyó el Tribunal de Apelaciones.
Por un lado, adolece de errores el procedimiento que si-guió el foro apelativo intermedio para traer al valor pre-sente la cuantía de $25,000. El primero de ellos es que mul-tiplicó las cuantías concedidas antes de 1984 por 2.82, como si ese índice fuera de aplicación genérica. Lo cierto es que en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, utilizamos Tin valor adquisitivo para el dólar de $2.82 en el primer paso porque era ese el índice que, según Amadeo Murga, corres-pondía al ejercicio de llevar una cifra de 1963, año del caso con el que se comparaba, al año base de 1984.
*918 El caso que el Tribunal de Apelaciones utilizó como re-ferencia es de 1983, por lo que, según Amadeo Murga, el índice que debió utilizarse para llevar la compensación al año base de 1984 era $1, no un valor adquisitivo de $2.82 por dólar. Además, erró el Tribunal de Apelaciones al asig-narle a diciembre de 2009 un valor adquisitivo de $0.82 al dólar como segunda parte del proceso.
Si bien es cierto que las estadísticas del Departamento del Trabajo y Recursos Humanos para diciembre de 2009 adjudicaron $0.82 al valor adquisitivo del dólar ese mes, ese valor utilizaba el 2006 como año base, no el 1984, año en que se fundamentó la primera parte del análisis de ac-tualización de la compensación al valor presente. El uso de dos años base distintos ocasiona un desfase obvio en el análisis.
Para seguir la primera parte del análisis que ilustra Amadeo Murga, si utilizamos como primer ejemplo el caso que escogió el Tribunal de Apelaciones, tenemos que bus-car el valor adquisitivo del dólar para 1983 y multiplicarlo por la cifra que concedimos en ese caso, que fue de $25,000. Si el índice de precios al consumidor para 1983 era de 62.27, ello significa que el valor adquisitivo del dólar era de $1.61.(6) Esto resulta en $40,250 que sería el ajuste por inflación de los $25,000 para el año base utilizado, es decir, el 2006.
El segundo paso de la primera parte del análisis exige que se actualice esa cantidad para llevarla al año en que se dictó sentencia, que en nuestro caso es el 2009. Para lo-grarlo, se tiene que dividir ese producto, $40,250, entre el *919 valor adquisitivo del dólar para 2009, que fue de $0.93.(7) Eso arroja $43,279 como resultado.
Ciertamente, una compensación de $43,279 para una persona que, como Jesús Manuel, sufrió durante más de 140 días a consecuencia de una cadena de actos de imperi-cia médica, resulta ridiculamente baja. Encontramos que ello obedece al contraste en el tiempo que se extendió la agonía de cada uno. En Colón v. Municipio de Guayama, supra, la víctima de 23 años recibió el golpe de un camión de plataforma, que le “desbarató la columna vertebral, de-jándole parapléjico, y le produjo una contusión cerebral, se mantuvo consciente todo el tiempo, hasta diez días más tarde, cuando falleció ... Los récords de su hospitalización revelan un angustioso cuadro de un joven aquejado de pro-fundos dolores, consciente de que su muerte era inevitable ...”. íd., pág. 196.
Si bien ambos pacientes padecieron inmenso dolor fí-sico, y eran conscientes de que su vida peligraba, no pode-mos perder de perspectiva que el sufrimiento de Jesús Manuel se prolongó por más de 140 días. Tal vez la víctima en Colón v. Municipio de Guayama, supra, tuvo un sufri-miento más intenso, pero se extendió durante diez días. El tiempo por el que un paciente sufre el daño es un elemento que debemos tomar en consideración. Colón v. Municipio de Guayama, supra, pág. 204.
Es prudente considerar las compensaciones otorgadas en otros casos para ampliar nuestro panorama, sin olvidar que ningún caso es exactamente igual a otro. En Toro Aponte v. E.L.A., 142 D.P.R. 464 (1997), concedimos una compensación de $150,000 a una víctima de impericia que tuvo dentro de su abdomen una gasa quirúrgica que se dejó allí inadvertidamente luego de una cesárea. El error mé-dico le provocó una infección por la que padeció vómitos, *920 diarreas y un dolor irresistible en el abdomen. Se le tuvo que someter a una colostomía para remover parte del in-testino grueso, que quedó perforado cuando se removió la gasa que infectó toda el área que la circundaba.
Esos $150,000 que concedimos en 1997, ajustados al valor presente según el método adoptado, representarían $198,387.(8) Nuevamente, tenemos que considerar que en Toro Aponte v. E.L.A., supra, el sufrimiento de la víctima se prolongó durante un mes. Otro elemento que debemos considerar en nuestro análisis es que la paciente sobrevivió la experiencia traumática.
En Morales v. Hosp. Matilde Brenes, 102 D.P.R. 188 (1974), compensamos a una víctima de impericia médica con $39,000 por los sufrimientos que padeció durante tres días, porque no se le diagnosticó adecuadamente una apendicitis(9) El paciente sobrevivió. El valor presente de esa cuantía, según el procedimiento adoptado, sería $109,032.
Los casos reseñados nos llevan a concluir que la com-pensación de $500,000 que concedió el Tribunal de Primera Instancia en el caso de Jesús Manuel, por los sufrimientos que padeció durante casi cinco meses, no fue exagerada-mente alta, como concluyó el Tribunal de Apelaciones.

Alejandro Rodríguez Ramos e Hilda Rodríguez Olavarría

En el caso de los progenitores de Jesús Manuel, el Tribunal de Primera Instancia concedió $225,000 a cada uno. *921 Luego del análisis que realizó el Tribunal de Apelaciones, esa cifra se redujo a $125,956.09.
El foro apelativo intermedio utilizó como marco de com-paración Hernández v. La Capital, 81 D.P.R. 1031 (1960). En ese caso, concedimos $15,000 a la madre de una niña que murió en el hospital ahorcada con el cordón de su ropa de dormir, como consecuencia de la supervisión indebida del hospital. Esos $15,000, que se concedieron a la madre por la muerte de la menor, la pérdida de su compañía y afecto, equivaldrían hoy a $76,129, según el método utilizado.(10) A diferencia del caso ante nos, en que el sufri-miento de Jesús Manuel duró casi cinco meses, allí la niña murió casi instantáneamente.
En un caso más reciente, Sagardía de Jesús v. Hosp. Aux. Mutuo, supra, concedimos $400,000 al padre y $300,000 a la madre de un bebé recién nacido quien, du-rante un mes, batalló por sobrevivir a un acto de impericia médica cometido al momento del alumbramiento. La sen-tencia del Tribunal de Primera Instancia en ese caso fue de 2004, por lo que el valor presente sería $486,022 y $364,516, respectivamente.(11)
Tenemos que ponderar que a diferencia de los dos casos traídos como comparación, en el caso que evaluamos hoy la víctima era un joven que sufrió en agonía durante casi cinco meses. Aunque la muerte de un hijo amado siempre ocasionará un dolor inmensurable, la agonía lenta au-menta el sufrimiento de sus progenitores. Eso debe pesar en nuestro análisis.
Con esos elementos en mente, también tenemos que concluir que la compensación que otorgó el Tribunal de Pri-mera Instancia a los padres de Jesús Manuel, Alejandro *922 Rodríguez Ramos e Hilda Rodríguez Olavarría, no fue exa-geradamente alta.

Alejandro Confesor y Marisol Rodríguez Rodríguez

El Tribunal de Primera Instancia concedió al hermano de Jesús Manuel, Alejandro Confesor Rodríguez Rodrí-guez, una partida idéntica a la de sus padres, $225,000. Destacó que la prueba que desfiló durante el juicio eviden-ció el apego y dedicación que demostró durante la convale-cencia de Jesús Manuel. A otra de sus hermanas, Marisol Rodríguez Rodríguez, le asignó una compensación de $50,000. A María del Carmen no se le concedió compensa-ción porque abandonó la causa de acción.
El Tribunal de Apelaciones también redujo las compen-saciones de los hermanos. A Alejandro Confesor le concedió $75,000 y a Marisol, $16,349.26. Ese foro inició su análisis con Ortiz Martínez v. Great American Indemnity Co., 83 D.P.R. 306 (1961). En ese caso, concedimos $2,000 a cada uno de los hermanos de un joven de 18 años que murió en un accidente automovilístico. El valor presente de esa cuantía es $9,914.(12)
Luego de evaluar ese caso, el Tribunal de Apelaciones se distanció de este precedente para hacer un reconocimiento de la dedicación, compromiso y amor que desplegó Alejandro Confesor Rodríguez Rodríguez hacia su hermano. Por ello, compensó su pérdida por una cuantía mayor a la de su hermana, apartándose de Ortiz Martínez v. Great American Indemnity Co., supra.
Por otro lado, en Velázquez Ortiz v. U.RR., supra, con-cedimos $10,000 a cada uno de los dos hermanos de un menor de dos años y medio. La hermana tenía 14 años y el hermano tenía 9 años al momento del deceso. Las circuns-tancias de la muerte del menor no surgen con claridad de *923 la sentencia, más allá de aseverarse que nació prematura-mente, era enfermizo y que su fallecimiento fue consecuen-cia de actos de impericia médica que cometieron los demandados. El valor presente de los $10,000 sería unos $14,731 aproximadamente, según el método señalado.(13)
Nuevamente, tenemos que reconocer las diferencias en-tre los casos evaluados y el que hoy nos ocupa. El caso de Jesús Manuel fue mucho más prolongado. En cuanto a Marisol Rodríguez Rodríguez, el Tribunal de Apelaciones re-dujo a $16,349.26 la cuantía de $50,000 que había conce-dido el Tribunal de Primera Instancia. En los casos citados como referencia vemos que las compensaciones otorgadas a hermanos, traídas al valor presente, fluctúan entre $9,900 y $15,000. Es por esto que una partida de $50,000 como la que concedió el foro de instancia no es exageradamente alta, considerando el tiempo que convaleció Jesús Manuel.
En el caso de Alejandro Confesor Rodríguez Rodríguez, el Tribunal de Primera Instancia destacó su sacrificio y el compromiso que asumió de buscar alternativas para salvar la vida de su hermano. Incluso, estuvo continuamente a su lado, le dio apoyo emocional y gestionó su admisión en un hospital de Connecticut, donde finalmente Jesús Manuel murió. En este extremo optamos por dar también deferen-cia a la cuantía que concedió el Tribunal de Primera Instancia.
V
Por los motivos antes expuestos, restituimos las com-pensaciones por daños que otorgó el Tribunal de Primera Instancia. Es decir, $500,000 para Jesús Manuel; $225,000 para la Sra. Rodríguez Olavarría, el Sr. Rodríguez Ramos *924 y el Sr. Rodríguez Rodríguez, cada uno, y $50,000 a Marisol Rodríguez Rodríguez.

Al mismo tiempo, devolvemos el caso al Tribunal de Pri-mera Instancia para que detalle la porción de responsabi-lidad en que incurrió cada uno de los demandados, aunque hayan transigido su responsabilidad, y lo desglose así en la sentencia. La porción de responsabilidad de los demanda-dos relevados de responsabilidad interna y externa, si al-guna, debe restarse proporcionalmente de la partida de compensación de daños adjudicada.

Se dictará sentencia de conformidad.

La Juez Asociada Señora Rodríguez Rodríguez emitió una opinión concurrente y disidente.

 Disponible a través de la página cibernética del Instituto de Estadísticas de Puerto Rico:
http://www.estadisticas.gobierno.pr/iepr/Estadisticas/Basesdedatos/ Econom%C3[a.aspx#IPC (última visita 5 de junio de 2012).

 Informe a la Junta de Directores sobre la concatenación del índice de Precios al Consumidor, 6 de diciembre de 2009, pág. 1. Disponible en:
http://cce.estadisticas.gobierno.pr/Documentos/ 99DBD8CE-B1BB-4D2C-A2FC-3D52ED53346D/comunicado_20091206.pdf (última visita 20 de junio de 2012).

 Íd., pág. 1.

 Íd., pág. 6.

 Cabe destacar que, según el boletín Actividad SocioEconómica de Puerto Rico que publica la Junta de Planificación, el Producto Bruto es el valor en el mercado de la producción económica que originan los residentes de Puerto Rico. Actividad So-cioEconómica de Puerto Rico, Junta de Planificación, Volumen IV Número 5, mayo 2012, pág. 4. Esa definición es cónsona con la que provee Amadeo Murga, quien indica que “[e]l índice representa el conjunto de bienes y servicios producidos por los ciudadanos de Puerto Rico, dividido entre el número de habitantes a precios corrientes”. A.J. Amadeo Murga, El valor de los daños en la responsabilidad civil, 2da ed., España, Bosch Editor, 2012, pág. 72. Es decir, mientras el Producto Bruto mide la producción de una localidad, el índice de precios al consumidor mide el consumo.

 Para calcular el valor adquisitivo del dólar dividimos 100 entre el índice de precios al consumidor seleccionado. Así obtenemos el mismo valor adquisitivo del dólar que provee el Departamento del Trabajo y Recursos Humanos en sus boletines mensuales. Somos conscientes de que el artículo del profesor Alvarez utiliza 98 cen-tésimas (0.98) como factor para calcular el valor adquisitivo del dólar, correspon-diente al año base 2006. Sin embargo, optamos por apegarnos al factor que coincide con el cálculo que publica el Departamento del Trabajo y Recursos Humanos.

 El valor adquisitivo del dólar para 2009 se obtuvo de la división de 100 entre el índice de precios al consumidor para ese año, ascendente a 107.81, con el 2006 como base.

 Para traer la cifra de $150,000 al valor presente ajustada a la inflación, la multiplicamos por el valor adquisitivo del dólar para el año de la sentencia, que fue de $1.23. Ese valor adquisitivo del dólar surge de la división de 1 entre el índice de precios al consumidor para el 1997, que fue de 81.14.
El producto, $184,500, se divide entre el valor adquisitivo del dólar para el año en que se resolvió el caso que hoy revisamos, que es $0.93 (1 dividido entre el índice de precios al consumidor para el 2009, que fue de 107.81). De esa forma, el ajuste por inflación elevaría los $150,000 de 1997 a $198,387 en el 2009.

 El valor adquisitivo del dólar para 1974 es $2.60, que se multiplican por los $39,000 que se otorgaron como compensación para luego dividirlos entre $0.93. Así que el ajuste por inflación representa una cifra de $109,032.

 El valor adquisitivo del dólar para 1960 es $4.72, que se multiplican por los $15,000 que se otorgaron como compensación para luego dividirlos entre $0.93. Así que el ajuste por inflación representa una cifra de $76,129.

 El valor adquisitivo del dólar para 2004 es $1.13, que se multiplican por $400,000 y $300,000 que se otorgaron como compensaciones a los padres, para luego dividirlos entre $0.93. Así que el ajuste por inflación representa una cifra de $486,022 y $364,516, respectivamente.

 El valor adquisitivo del dólar para 1961 es $4.61, que se multiplican por los $2,000 que se otorgaron como compensación para luego dividirlos entre $0.93. Así que el ajuste por inflación representa una cifra de $9,914.

 El valor adquisitivo del dólar para 1991 es $1.37, que se multiplican por los $10,000 que se otorgaron como compensación a cada hermano, para luego dividirlos entre $0.93. Así que el ajuste porinflación representa una cifra de $14,731.